MEEKER et al. v. LEHIGH VALLEY R. CO.

(Circuit Court, S. D. New York. June 6, 1908.)

1. JURY—TRIAL BY JURY—NATURE OF ACTION.

An action by a shipper, authorized by the Sherman anti-trust law (Act July 2, 1890, c. 647, § 7, 26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]), to recover treble damages to his business and property by reason of a conspiracy and combination by interstate carriers to charge excessive and unlawful rates for the shipment of coal from the mines to tide water, was an action at law as to which the parties were entitled to a jury trial.

[Ed. Note.—Right to trial by jury in federal court, see notes to O'Connell v. Reed, 5 C. C. A. 603; Vany v. Peirce, 26 C. C. A. 528.]

2. CARRIERS—RATES—INTERSTATE COMMERCE LAW—COMPLIANCE.

Congress by Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), having established the Interstate Commerce Commission with plenary power to determine in the first instance what rates for the transportation of interstate commerce are legal and reasonable and what are illegal and excessive, it will be presumed, in the absence of averments to the contrary, that every interstate carrier has complied with the law by establishing, printing, filing, publishing, and posting them; and hence no action can be maintained unless the complaint alleges that resort has been had to the Interstate Commerce Commission and the rate charged and paid declared excessive or unreasonable.

3. SAME—PLEADING.

In an action for injuries to complainant's property and business by an alleged combination and conspiracy between interstate railroads controlling the shipment of anthracite coal, an allegation that plaintiffs' loss resulted from their being obliged to pay "unlawful rates" for the transportation of coal due to such combination and conspiracy was not effective to allege that the rates charged had been declared unlawful by the Interstate Commerce Commission.

[Ed. Note.—Jurisdiction of federal courts of suits under interstate commerce act, see note to Bailey v. Mosher, 11 C. C. A. 318.]

4. SAME—STATUTES—SCOPE.

The Sherman anti-trust law (Act Cong. July 2, 1890, c. 647, § 7, 26 Stat. 210 [U. S. Comp. St. 1901, p. 3202]), does not give any right of action for damages sustained by the payment of excessive, unjust, or unreasonable rates to interstate carriers, such relief being provided for by the interstate commerce act.

5. PLEADING—CONCLUSIONS OF LAW—DEMURRER.

An allegation in a complaint against an interstate carrier that plaintiffs had been obliged to pay excessive and unlawful rates without any facts to support the same was a statement of a mere conclusion of law, which was not admitted by demurrer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Pleading, § 527.]

## At Law.

Demurrer to complaint in action to recover damages alleged to have been sustained by plaintiffs by reason of an alleged conspiracy and combination to raise the charges for the transportation of anthracite coal between the mines in Pennsylvania and tide water in New York and New Jersey, and to monopolize the trade and commerce in anthracite coal between said states, and obtain control of all the coal in Pennsylvania, and to raise the market price therefor and to compel independent shippers (of whom plaintiffs are one) who should continue to compete to pay such excessive rates for the transportation of anthracite coal as to prevent such independent shippers from competing with such conspirators at any profit.

Shearman & Sterling, for plaintiffs.
Alexander & Green (Frank H. Platt, of counsel), for defendant.

RAY, District Judge. The bill of complaint alleges a conspiracy and combination between certain parties to do certain acts, and charges that it was a combination and conspiracy in restraint of trade and commerce among the several states which is illegal and in violation of Act Cong. July 2, 1890, c. 647, 26 Stat. 209 (U. S. Comp. St. 1901, p. 3200), entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and known as the "Sherman Anti-Trust Act," and that, "by reason of the said conspiracy and combination, the plaintiffs have been injured in their business and property by the defendant to their damage in the sum of $250,000," and demand judgment for three times that sum, viz., $750,000.

The complaint is more specific than above stated in its allegation of the damage sustained by reason of the conspiracy and combination and its execution, and says:

"(12) Pursuant to the said conspiracy and combination to obtain absolute control of the market for anthracite coal, and to that end to make the rates

of transportation prohibitory to independent operators and shippers, the anthracite companies had previously increased the percentages of the tide water price which they paid to the owners of coal mining properties for their coal, and, as a condition for so doing, they had also exacted from all such owners perpetual contracts for the delivery to the anthracite companies or companies controlled by them of all their coal. In this manner the anthracite companies acquired the control of nearly all the anthracite coal mined, and substantially increased the market prices therefor at the mines, but they did not obtain exclusive control.

"(13) As a result of the foregoing unlawful acts, in which the defendant participated, the independent dealers and shippers were obliged to pay for the larger sizes of coal, at the mines, a price representing 65 per cent. of the tide water market prices for the larger sizes and a price correspondingly larger for the smaller sizes, and they were required by the anthracite companies to pay on the larger sizes of coal more than 35 per cent. of the tide water price for the transportation of such coal to New York tide water for the first few years, and correspondingly higher rates on the smaller sizes, and they are required to pay about that percentage under the present prices of coal; so that, after allowing for wastage incidental to handling and the expenses connected with the sale and delivery of the coal to the consumers, the independent shippers have been unable to ship coal to the New York market at the said rates, except at a loss, and substantially all of them have been forced out of business at Perth Amboy except the plaintiffs, and the plaintiffs have been obliged to pay excessive and unlawful rates upon all coal shipped by them to tide water over the lines of the defendant. While the tariff rates thus prescribed also made it impossible for the coal companies controlled by the anthracite companies to make any profit, it has made no difference in the general result to the anthracite companies, as what their coal companies thus lost the anthracite companies gained, and it is a mere matter of bookkeeping between the respective parent and puppet companies."

The plaintiffs do business under the firm name of "Meeker & Co.," and are engaged in the business of buying, shipping, and selling anthracite coal, and since 1898 have been shipping large quantities thereof over the lines operated by the defendant from mines in Pennsylvania to tide water at Perth Amboy, N. J., and thence to the New York market. The Lehigh Valley Coal Company, a Pennsylvania corporation, is engaged in the same business at the same places. The defendant company owns and controls its entire capital stock, and the greater part of the coal transported by it since 1899 was owned by the coal company. Eight different railroads transport coal from the anthracite region to New York Harbor. These companies, directly or indirectly, own coal lands and largely control the market for anthracite coal in the Eastern market. These, except the Pennsylvania Railroad Company, the complaint designates as the "Anthracite Companies." Subdivision 6 of the complaint alleges the conspiracy as follows:

"(6) In or about the year 1899 the anthracite companies, including the defendant, conspired and combined together to raise the charges for the transportation of anthracite coal between the mines in Pennsylvania and tide water in New Jersey and New York, and to monopolize the trade and commerce in anthracite coal between the said states and thereby to obtain control of substantially all the anthracite coal in Pennsylvania and to raise the market price therefor, especially in the New York market, and to compel such independent shippers as should continue to compete with them, to pay such excessive rates for the transportation of anthracite coal as to prevent such shippers from competing with them at any profit; and they have ever since maintained such conspiracy and combination."

Subdivision 8 reads as follows:

"(8) Any charge made by the defendant for transporting anthracite coal from the breakers, at the said mines or collieries, to tide water, in excess of the difference between the market price at tide water and a sum representing the price prevailing at the breakers, together with the expenses of selling the coal and a reasonable allowance for interest and profits is an unreasonable and excessive and unlawful charge, because it does not permit independent shippers, including the plaintiff, to sell coal except at a loss, and has resulted in enabling the anthracite companies, owning, as they do, the capital stock of their subsidiary coal companies, to drive nearly all independent shippers out of the market; for the excessive rates paid by the subsidiary coal companies are received by the anthracite companies, respectively, and the apparent losses to the coal companies are consequently only nominal as to the anthracite companies."

Subdivision 11 reads as follows:

"(11) The said anthracite companies adopted the said recommendations made by the said committee, and in further execution of the said conspiracy and combination, and for the purpose of raising the rates for the transportation of coal and making it impossible for all independent shippers or middlemen, including the plaintiffs, to continue in business and of thus insuring their absolute control of the anthracite coal market from August, 1901, the anthracite companies, including the defendant, which prior to 1901, as hereinbefore alleged, had not charged more than the difference between the market price of the coal at the breakers and the price at tide water for transporting coal, although they had been publishing nominal tariff rates, began to exact from all independent shippers a fixed charge per ton for carrying coal to tide water in excess of such difference in prices, amounting to $1.55 per ton for prepared coal, $1.40 per ton for pea coal, $1.25 per ton for buckwheat coal, and $1.10 for coal smaller than buckwheat coal; but during the said period any charge made by the defendant for transporting anthracite coal between the said points in excess of $1 per ton constituted an unreasonable and excessive charge, and the said charges to the plaintiffs were not only far in excess of the value of the services rendered and far more than the companies had previously received for such service, but they were in excess of the difference between the prices realized for the coal at New York tide water, after allowing for the expenses of selling and the prices paid for it at the mines, and constituted an excessive, unreasonable, and unlawful charge for the said services."

I find in this complaint no suggestion that plaintiffs have purchased any coal at an increased price because of the conspiracy or alleged illegal combination. The damages charged are the payment of an unreasonable and excessive charge or rate by the defendant for transporting coal made so by the conspiracy and combination aforesaid; that is:

"And the plaintiffs have been obliged to pay excessive and unlawful rates upon coal shipped by them to tide water over the lines of the defendant."

This is an action at law, and the parties are entitled to a jury trial. Concede the combination and the conspiracy, the "purpose of raising the rate for the transportation of coal," and "to raise the charges for the transportation of anthracite coal," and that it has been done, and that plaintiffs have paid such increased rates, is a cause of action alleged? There is no allegation that the Interstate Commerce Commission has examined into the matter and found, declared, or adjudged the rates of transportation complained of and charged by defendant company and paid by plaintiffs to be either illegal, unreason-

able, or excessive. It is not charged that the matter has been brought to the attention of that commission in any way. There is no averment in the complaint that the defendant and all the anthracite companies did not establish, publish, and file their rates for transporting coal as required by law. The averment is that they did publish nominal tariff rates.

The Sherman anti-trust law, so called, declares (section 7) that:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any circuit court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

The plaintiffs must have been injured in their business or property, and the injury sustained must be charged in the complaint by proper averment. Without injury the action cannot be maintained. Unless there be an averment of injury, no cause of action is stated. Here the allegation of injury is:

"The plaintiffs have been obliged to pay excessive and unlawful rates upon all coal shipped by them to tide water over the lines of the defendant."

The compulsory payment of excessive and unlawful rates would, of course, constitute an injury to the plaintiffs in their business and property. But does this complaint sufficiently charge the payment of excessive and unlawful rates? It is conceded that these rates paid by the plaintiffs to the defendant company were paid for the transportation of interstate commerce, coal transported by the defendant from one state to another. Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), to regulate commerce, as amended by Act June 29, 1906, c. 3591, 34 Stat. 584 (U. S. Comp. St. Supp. 1907, p. 892), establishes the Interstate Commerce Commission, authorizes that commission to inquire fully into the management of the business of all common carriers subject to the provisions of the act—all engaged in interstate and foreign commerce—obtain from them full and complete information necessary to enable the commission to perform the duties and carry out the objects for which it was created. Section 13 provides for complaints by any person, firm, etc. Section 15 provides as follows:

"That the commission is authorized and empowered, and it shall be its duty, whenever, after full hearing upon a complaint made as provided in section thirteen of this act, or upon complaint of any common carrier, it shall be of the opinion that any of the rates, or charges whatsoever, demanded, charged, or collected by any common carrier or carriers, subject to the provisions of this act, for the transportation of persons or property as defined in the first section of this act, or that any regulations or practices whatsoever of such carrier or carriers affecting such rates, are unjust or unreasonable, or unjustly discriminatory, or unduly preferential or prejudicial, or otherwise in violation of any of the provisions of this act, to determine and prescribe what will be the just and reasonable rate or rates, charge or charges, to be thereafter observed in such case as the maximum to be charged; and what regulation or practice in respect to such transportation is just, fair, and reasonable to be thereafter followed; and to make an order that the carrier shall cease and desist from such violation, to the extent to which the commission find the same to exist, and shall not thereafter publish, demand, or

collect any rate or charge for such transportation in excess of the maximum rate or charge so prescribed, and shall conform to the regulation or practice so prescribed. All orders of the commission, except orders for the payment of money, shall take effect within such reasonable time, not less than thirty days, and shall continue in force for such period of time, not exceeding two years, as shall be prescribed in the order of the commission, unless the same shall be suspended or modified or set aside by the commission or be suspended or set aside by a court of competent jurisdiction."

## Section 6 provides:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act and print and keep open to public inspection schedules showing all the rates, fares, and charges for transportation between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established. If no joint rate over the through route has been established, the several carriers in such through route shall file, print, and keep open to public inspection, as aforesaid, the separately established rates, fares and charges applied to the through transportation. The schedules printed as aforesaid by any such common carrier shall plainly state the places between which property and passengers will be carried, and shall contain the classification of freight in force, and shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the commission may require, all privileges or facilities granted or allowed and any rules and regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee, Such schedules shall be plainly printed in large type, and copies for the use of the public shall be kept posted in two public and conspicuous places in every depot, station, or office of such carrier where passengers or freight, respectively, are received for transportation, in such form that they shall be accessible to the public and can be conveniently inspected. The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act."

While there are other pertinent sections and paragraphs contained in the act, I do not think it necessary to recite or refer to them.

It seems to me very plain that the Congress of the United States, having full power in the premises, has established this commission, and conferred upon it plenary power to determine, in the first instance at least, what rates for the transportation of interstate commerce are legal and what are illegal; that is, what rates are proper and just and reasonable and what are improper, unjust, excessive, and consequently, when so declared, illegal. It also seems clear to me that all complaining shippers are relegated to this commission, in the first instance at least, for the settlement and determination of the propriety, justice, fairness, and reasonableness of the rates established, filed, published, and posted. And I think it is presumed, in the absence of averments to the contrary, that every common carrier engaged in interstate commerce has complied with the law by establishing rates and printing, filing, publishing, and posting them. In Texas & Pacific Railway Company v. Abilene Cotton Oil Company, 204 U. S. 426, 439, 440, 441, 448, 27 Sup. Ct. 350, 355, 51 L. Ed. 553, the court held:

"The interstate commerce act was intended to afford an effective and comprehensive means for redressing wrongs resulting from unjust discrimina-

tions and undue preference, and to that end placed upon carriers the duty of publishing schedules of reasonable and uniform rates; and, consistently with the provisions of that law, a shipper cannot maintain an action at common law in a state court for excessive and unreasonable freight rates exacted on interstate shipments where the rates charged were those which had been duly fixed by the carrier according to the act, and had not been found to be unreasonable by the Interstate Commerce Commission."

At pages 439–441 of 204 U. S., pages 354 and 355 of 27 Sup. Ct. (51 L. Ed. 553), the court said:

"When the act to regulate commerce was enacted, there was contrariety of opinion whether, when a rate charged by a carrier was in and of itself reasonable, the person from whom such a charge was exacted had at common law an action against the carrier because of damage asserted to have been suffered by a discrimination against such person or preference given by the carrier to another. Parsons v. Chicago & Northwestern Ry., 167 U. S. 447, 455, 17 Sup. Ct. 887, 42 L. Ed. 231; Interstate Commerce Commission v. Baltimore & Ohio R. R., 145 U. S. 263, 275, 12 Sup. Ct. 844, 36 L. Ed. 699. That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act. Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 494, 17 Sup. Ct. 896, 42 L. Ed. 243. And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law. Cincinnati, New Orleans & Texas Pacific Ry. Co. v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935; Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 17 Sup. Ct. 896, 42 L. Ed. 243. When the general scope of the act is enlightened by the considerations just stated, it becomes manifest that there is not only a relation, but an indissoluble unity between the provision for the establishment and maintenance of rates until corrected in accordance with the statute and prohibitions against preferences and discrimination. This follows, because, unless the requirement of a uniform standard of rates be complied with, it would result that violations of the statute as to preferences and discrimination would inevitably follow. This is clearly so, for, if it be that the standard of rates fixed in the mode provided by the statute could be treated on the complaint of a shipper by a court and jury as unreasonable, without reference to prior action by the commission, finding the established rate to be unreasonable and ordering the carrier to desist in the future from violating the act, it would come to pass that a shipper might obtain relief upon the basis that the established rate was unreasonable in the opinion of a court and jury, and thus such shipper would receive a preference or discrimination not enjoyed by those against whom the schedule of rates was continued to be enforced. This can only be met by the suggestion that the judgment of a court, when based upon a complaint made by a shipper without previous action by the commission, would give rise to a change of the schedule rate, and thus cause the new rate resulting from the action of the court to be applicable in future as to all. This suggestion, however, is manifestly without merit, and only serves to illustrate the absolute destruction of the act and the remedial provisions which it created which would arise from a recognition of the right asserted. For if, without previous action by the commission, power might be exerted by courts and juries generally to determine the reasonableness of an established rate, it would follow that unless all courts reached an identical conclusion a uniform standard of rates in the future would be impossible, as the standard would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject as an original question.

Indeed, the recognition of such a right is wholly inconsistent with the administrative power conferred upon the commission and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. Equally obvious is it that the existence of such a power in the courts, independent of prior action by the commission, would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another, would destroy the prohibitions against preferences and discrimination, and afford, moreover, a ready means by which, through collusive proceedings, the wrongs which the statute was intended to remedy could be successfully inflicted. Indeed, no reason can be perceived for the enactment of the provision endowing the administrative tribunal, which the act created, with power, on due proof, not only to award reparation to a particular shipper, but to command the carrier to desist from violation of the act in the future, thus compelling the alteration of the old or the filing of a new schedule, conformably to the action of the commission, if the power was left in courts to grant relief on complaint of any shipper, upon the theory that the established rate could be disregarded and be treated as unreasonable, without reference to previous action by the commission in the premises. This must be, because, if the power existed in both courts and the commission to originally hear complaints on this subject, there might be a divergence between the action of the commission and the decision of a court. In other words, the established schedule might be found reasonable by the commission in the first instance and unreasonable by a court acting originally, and thus a conflict would arise which would render the enforcement of the act impossible."

And finally, at page 448 of 204 U. S., page 358 of 27 Sup. Ct. (51 L. Ed. 553), the court declared:

"Concluding, as we do, that a shipper seeking reparation predicated upon the unreasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce. It follows, from what we have said, that the court below erred in the construction which it gave to the act to regulate commerce."

While that case arose in the state courts and came on appeal into the Supreme Court of the United States, I do not understand that it makes any difference whether the action be brought in the courts of a state or in the courts of the United States. The underlying and controlling principle is found in the last part of the opinion just quoted. It follows that this demurrer must be sustained, unless it is unnecessary to allege in the complaint that resort has been had to the Interstate Commerce Commission and the rate charged and paid declared excessive or unreasonable.

The Sherman act of July 2, 1890, "An act to protect trade and commerce against unlawful restraints and monopolies," gives to the injured party a right of action in any Circuit Court of the United States to any person or firm "who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful" by such act, "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce * * * is hereby declared to be illegal." So "every person who shall monopolize, or attempt to monopo-

lize any part of the trade or commerce among the several states or with foreign nations shall be deemed guilty of a misdemeanor," etc. This act does not declare or purport to declare excessive or unreasonable or unjust rates for the transportation of interstate commerce illegal. If, however, there is a combination, contract, or conspiracy to raise rates, and charge and exact excessive and unreasonable or unjust or unjustly discriminatory, etc., rates for the purpose of restraining trade or commerce (see sections 1 and 3 of the act), or such combination has that effect, then undoubtedly the combination or contract is illegal. But are the rates charged and paid illegal for the reason the combination is illegal? This act must be read and construed in connection with the act to regulate commerce as amended to date. It is the latter act that deals specifically with rates, charges for the transportation of coal, etc., among the several states, from the one state to another, and, as seen, confers on this administrative commission power to ascertain and determine what rates are unjust, unreasonable, or excessive and consequently illegal. When it has acted on complaint made and declared a rate established by a common carrier engaged in interstate commerce unjust, excessive, or unreasonable, it is determined by and in the appropriate tribunal having jurisdiction and plenary power that such rate is illegal. When this is done, there is a proper basis for the recovery of damages in the District or Circuit Court of the United States under the provisions of section 9 of the act based on the compulsory payment of excessive and unlawful rates. This is the true construction and meaning of the act as declared by the Supreme Court of the United States in Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U. S. 437, 438, 27 Sup. Ct. 356, 51 L. Ed. 553, where the court, after reciting the powers of the commission, the duties and obligations of carriers as to rates, and the control of the commission over them, says:

"Nor is there merit in the contention that section 9 of the act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that the general terms of the section when taken alone might sanction such a conclusion, but, when the provision of that section is read in connection with the context of the act and in the light of the considerations which we have enumerated, we think the broad construction contended for is not admissible. * * * In other words, we think that it inevitably follows from the context of the act that the independent right of an individual originally to maintain actions in courts to obtain pecuniary redress for violations of the act conferred by the ninth section must be confined to redress of such wrongs as can, consistently with the context of the act, be redressed by courts without previous action by the commission, and therefore does not imply the power in a court to primarily hear complaints concerning wrongs of the character of the one here complained of."

Is the allegation in this complaint that "the plaintiffs have been obliged to pay excessive and unlawful rates upon all coal shipped by them to tide water over the lines of the defendant" equivalent to an averment that the rates charged and paid have been declared excessive, or unjust, or unreasonable by the Interstate Commerce Com-

mission? A mere allegation that such rates were "excessive" is not. But the allegation is that the plaintiffs were obliged to pay "unlawful rates." In the minds of the plaintiffs and the pleader in making this allegation the "unlawful" character of the rate may be because of the combination or conspiracy, or because of its increase over former rates, etc. The averment does not necessarily charge or import that the rate established by the anthracite companies, including defendant, and paid by the plaintiffs, has been declared excessive by the Interstate Commerce Commission and consequently declared unlawful.

If it be true, and I hold it is, that a resort to the Interstate Commerce Commission is a condition precedent to the maintenance of an action in the Circuit Court of the United States to recover damages solely occasioned by the payment of excessive, unjust, or unreasonable rates for the transportation of interstate commerce, even when the exaction of such excessive rates was the result of a combination or conspiracy made unlawful by the "Sherman anti-trust law," then the complaint in such an action to recover such damages solely must aver that the rates charged and exacted have been declared excessive or unreasonable or unjust by the Interstate Commerce Commission. Until that is done, the rates established, filed, published, and posted must be regarded as legal rates or lawful rates. Whether or not that has been done is an issuable fact, and the defendant has the right to be informed whether the plaintiff will attempt to prove that the rate has been condemned by the Interstate Commerce Commission. If alleged to have been so condemned, the defendant may show that the proceeding was irregular, that he did not have notice or an opportunity to be heard, etc. The plaintiff might show, under proper allegations, that the rate exacted was illegal or unlawful, because in excess of that established, filed, published, and posted, or that the rate exacted was illegal, or unlawful, because in excess of that fixed by the commission, or because no rate at all had been established, filed, and published as required by law. In either case the rate would be unlawful. Under the act for the regulation of commerce, the carrier has no right to charge or collect any rate whatever until it has been established, filed, and published. So the carrier has no right to exact a higher rate than that fixed in the filed and published schedules, and, if that has been held to be excessive, or unjust, or unreasonable, then the carrier cannot exact that. Should not the complaint state the ground on which it is claimed the rate paid was an unlawful rate? Facts showing it was an unlawful rate? I think this clearly so. Hieronymus v. N. Y. Nat. L. Assn., 107 Fed. 1005, 46 C. C. A. 684, affirming 101 Fed. 12; Williamson v. Beardsley, 137 Fed. 467, 469, 69 C. C. A. 615; W. H. Thomas & Son v. Barnett (C. C.) 135 Fed. 172, 176; St. Louis R. Co. v. Johnston, 133 U. S. 566, 577, 10 Sup. Ct. 390, 33 L. Ed. 683; Ritchie v. McMullen, 159 U. S. 235, 16 Sup. Ct. 171, 40 L. Ed. 133, affirming (C. C.) 41 Fed. 502, 8 L. R. A. 268; England v. Russell (C. C.) 71 Fed. 818. I do not think the Sherman anti-trust law, so called, gives any right of action for damages sustained by the payment of excessive, unjust, or unreasonable rates. I do not think that this complaint states any cause of action whatever under the provisions of that act. The cause of action for such damages as

are alleged here is given by the act to regulate commerce. But, treating the allegations of the complaint to the effect that this was a combination and conspiracy in restraint of trade and commerce among the several states, and that by reason thereof the plaintiffs have been injured in their business and property by the defendant in the sum of $250,000 as surplusage, see American Union Coal Co. v. Pennsylvania R. Co. (C. C.) 159 Fed. 278, 279, and, treating the action as really under the provisions of the act to regulate commerce—"Interstate Commerce Act"—no cause of action is stated. The allegation that "plaintiffs have been obliged to pay excessive and unlawful rates" is the statement of a mere conclusion of law with no facts to support it. It is a familiar rule that such allegations are not admitted by a demurrer.

The plaintiff says that the complaint charges, and the defendant admits by the demurrer, that by reason of the combination and conspiracy, the plaintiffs were compelled to do business "at a loss." Concede this to be so, still the action is for damages, and the only loss or injury in business or property is stated to be the payment of excessive and illegal rates for the transportation of coal from Pennsylvania into New Jersey; that, therefore, he made no profit and even lost money to the extent of the excessive charge made and exacted over a reasonable rate. Hence no damages to business or property is alleged except in the payment of "excessive rates" or "unlawful rates," and, as this is a mere conclusion not accompanied by the statement of any facts showing the rates paid to be either unlawful or excessive, the complaint does not state facts sufficient to constitute a cause of action, and the demurrer is sustained, with costs. The plaintiffs may file and serve an amended complaint within 30 days after being served with a copy of the order to be entered pursuant hereto on payment of such costs.