TERMINAL WAREHOUSE CO. *v.* PENNSYLVANIA RAILROAD CO. ET AL.

No. 351. Argued January 15, 16, 1936.—Decided March 2, 1936.

*Messrs. Thomas Raeburn White* and *John J. Hickey,* with whom *Messrs. Walter W. Ahrens* and *Wm. A. Schnader* were on the brief, for petitioner.

502

*Messrs. John Hampton Barnes* and *Robert T. Mc-Cracken,* with whom *Messrs. George G. Chandler, Frederic D. McKenney,* and *Henry Wolfe Biklé* were on the brief, for respondents.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

In this action under the Anti-Trust Laws (15 U. S. C., §§ 1, 15) for the recovery of treble damages, the Terminal Warehouse Company, petitioner in this court, accuses a competitor, the Merchants Warehouse Company, and the Pennsylvania Railroad Company, an interstate com-

mon carrier, of an unlawful combination in restraint of trade and commerce.

, The business of Merchants Warehouse Company, which for brevity will be spoken of as Merchants, began in January, 1887. Its site was the City of Philadelphia. At the beginning there were two warehouses, both in convenient proximity to the Pennsylvania's tracks and terminals. Other buildings were added from time to time by purchase or by lease to serve other sections of the city. From the outset Merchants had contracts with Pennsylvania for privileges and payments special to itself. These are the contracts of which Terminal complains. They were renewed as they ran out from 1887 to 1931, a separate contract being made with reference to each building. For present purposes a summary of one contract will serve as a summary of all, though they differ in particulars. For illustration we choose the contract of January 25, 1917, which has to do with the warehouse at Water and Chestnut Streets. By this contract Pennsylvania agrees to maintain tracks adjacent to the warehouse and to make payments at stipulated rates for services rendered by the warehouse in the receipt and delivery of freight. While the contract is in force, there is to be no allowance for such services to any other warehouse company in the City of Philadelphia. In return Merchants agrees to give a preference to Pennsylvania over other lines in the use of its facilities; to load and unload freight promptly and efficiently; to collect charges due for incoming freight, and to be responsible to the railroad company therefor.

No secret was made of the existence of this contract or of any of the others. On the contrary, the substance of the whole arrangement was set forth in the tariffs of the railroad filed with the Interstate Commerce Commission and open to the public. Pennsylvania there showed that it had designated the warehouses of Merchants as stations for the receipt and delivery of freight. It also

showed the amount of the payments and allowances to be made to Merchants for services in handling freight at the stations so designated. For many years the practice went unchallenged by any agency of government. The assumption was that the warehouses, though not owned by Pennsylvania, were, none the less, public freight stations supplied by a contractor (*United States* v. *Baltimore & Ohio R. Co.*, 231 U. S. 274, 288), and that the railroad in making payments or allowances for the handling of the freight was paying for transportation services rendered by an agent. Decisions of the Interstate Commerce Commission bring this out in clear relief. Keystone Warehouse Co. *v.* Pennsylvania R. Co., 53 I. C. C. 335; Keystone Elevator & Warehouse Co. *v.* Director General, 73 I. C. C. 273, 274; McCormick Warehouse Co. *v.* Pennsylvania R. Co., 95 I. C. C. 301. Those cases stood unquestioned until 1928, when one of them (McCormick Warehouse Co. *v.* Pennsylvania R. Co., *supra*) was reheard and overruled (148 I. C. C. 299), earlier decisions to the same effect falling along with it. The conclusion was then announced that a warehouse company doing business under such a contract was a consignor or consignee, acting on its own behalf and not as agent for the carrier. With this change in its relation discriminatory payments or allowances became forbidden and unlawful. 49 U. S. C., § 3 (1).

Terminal, a rival warehouse, organized in 1904, was quick to occupy the vantage-ground left open by that ruling. It laid before the Interstate Commerce Commission a complaint charging Pennsylvania with unjust discrimination in the practices described. It asked that a restraining order protect it for the future, and that there be an award of reparation for losses suffered in the past. There were separate complaints as to the acts of other railroads (The Baltimore & Ohio and the Reading), which had terminal arrangements with warehouses of their own

selection. Neither of these other roads had given a preference to Merchants, and none of the three was acting in concert with any other. The Commission, adhering to its ruling in the *McCormick Warehouse* case, held that the designated warehouses were in truth not public freight stations, however the carriers might style them. From this it followed that allowances and special privileges accorded on the footing of an agency relation would have to be abandoned. Gallagher *v.* Pennsylvania R. Co., 160 I. C. C. 563. The railroads were required to cancel any tariff provisions whereby "the facilities of the contract warehouses" were made "a part of the respective station facilities" of the lines affected by the order. They were required to "cease and desist" from publishing or making the discriminatory privileges and allowances growing out of the attempt to treat the warehouse companies as agents. On the other hand, the Commission refused an award of reparation. "The evidence is far too vague and indefinite to warrant the conclusion that complainants have suffered actual pecuniary loss attributable directly to the alleged unlawful practices."

The carriers, together with Merchants and other warehouse companies interveners in the proceeding, brought suit in a federal court (three judges sitting) to vacate the order of the Commission. The bills of complaint were dismissed, one judge dissenting. 44 F. (2d) 379. Upon appeal to this court the decree was affirmed. *Merchants Warehouse Co.* v. *United States,* 283 U. S. 501. The opinion there rendered is so exact in its description of the nature and effect of the unlawful practices as to make elaboration useless now. In particular the court points out that a warehouse designated as a station was in a position to receive package freight in less than carload lots, and ship it at carload rates without charge to the customer for assembling the packages and loading them, this by reason of the fact that the warehouse had been

paid by the railroad for doing that very work. To that extent it could afford to underbid competitors. For the same reason it had a position of superiority over against its rivals in unloading carload lots, for it could distribute and re-ship in packages at the expense of the carrier. This advantage as to package freight, if permitted to continue, would have taken the life out of rules designed to limit the character of transportation services. By rule 23 of the Consolidated Freight Classification a carrier may not distribute carloads of freight in less than carload lots, nor assemble smaller lots into carloads. 283 U. S. at p. 510. Thus the opinion makes it clear that the whole system of warehouse stations, with its payments and allowances, including the incidental saving of demurrage, had been built upon a false foundation. Adherence to the statute called for its suppression.

We have seen that Terminal asked for reparation as well as for a restraining order at the hands of the Commission. There is no doubt that the Commission had jurisdiction in response to that request to make an award against the railroad for damages suffered by the complainant as a result of the unlawful practices. 49 U. S. C., §§ 8, 9, 16 (1) (2); *Interstate Commerce Comm'n* v. *United States,* 289 U. S. 385; *Louisville & Nashville R. Co.* v. *Ohio Valley Tie Co.,* 242 U. S. 288; *Pennsylvania R. Co.* v. *Jacoby & Co.,* 242 U. S. 89; *Meeker* v. *Lehigh Valley R. Co.,* 236 U. S. 412; *Pennsylvania R. Co.* v. *International Coal Mining Co.,* 230 U. S. 184. The Commission found, however, that no damages had been proved, and its ruling as to that was final, not subject to review by this court or any other. *Interstate Commerce Comm'n* v. *United States, supra,* at p. 388; *Baltimore & Ohio R. Co.* v. *Brady,* 288 U. S. 448; *Standard Oil Co.* v. *United States,* 283 U. S. 235; *Alton R. Co.* v. *United States,* 287 U. S. 229; *Procter & Gamble Co.* v. *United States,* 225 U. S. 282. True, the complainant might have

confined itself to a request for a restraining order, and after thus invalidating the preference have asked a court for reparation. 49 U. S. C., § 9. It had a choice, in other words, between a remedy at the hands of the Commission and a remedy by suit, but by express provision of the statute it could not have them both. *Baltimore & Ohio R. Co.* v. *Brady, supra.* Reparation under the Commerce Act was thus permanently barred by the ruling of the Commission as against the offending carrier. The situation was altogether different, however, in respect of the liability of Merchants and other aiders and abettors. As to wrongdoers other than the carrier the complainant had not asked the Commission to fix the quantum of the damages, thus relieving us of the duty to inquire whether jurisdiction would have existed if such relief had been demanded. 49 U. S. C., §§ 9, 16 (1), and compare 49 U. S. C., § 42. Merchants would not have been affected by an award of reparation if the Commission had found the evidence sufficient for that relief, and it gains nothing from the fact that reparation was refused. In saying this we are not unmindful that it intervened in the proceeding. It was interested in the event, for it would be harmed by a restraining order. 49 U. S. C., § 42. Intervention, though permitted, did not broaden the complaint, nor add to the range of enumerated powers. Accordingly the framers of the statute were careful to provide that aiders and abettors should not go unwhipped of justice. In a suit under the Commerce Act, all persons soliciting or procuring the allowance of a forbidden preference were to be liable, jointly or severally, to make good the damage suffered. 49 U. S. C., § 10 (4).* Cf. 49 U. S. C., § 41 (3). Here was

---

\* *"Inducing unjust discrimination; penalty; liability for damages.* If any such person, or any officer or agent of any such corporation or company, shall, by payment of money or other thing of value, solicitation, or otherwise, induce or attempt to induce any common

an ample remedy to reach a guilty participant in an unlawful discrimination, whether reparation against the carrier had been granted or refused.

Petitioner, not satisfied to proceed under the Commerce Act, put that remedy aside and brought suit under the Sherman and Clayton Acts, hoping by that manoeuvre to charge both carrier and warehouse, and to charge them with treble damages. Every act of wrongdoing proved in the new suit to have been committed by the defendants was proved against them also (with unsubstantial exceptions) in the case before the Commission. Now as before, the head and front of their offending is the use of the warehouses as stations for the carrier with the allowances and privileges, such as exemption from demurrage, growing out of that relation. What is true of the offense is true also of its consequences. There has been no proof of any loss that would not be provable in equal measure in proceedings under the Commerce Act upon a claim for reparation. *Interstate Commerce Comm'n* v. *United States, supra; Louisville & Nashville R. Co.* v. *Ohio Valley Tie Co., supra.* Terminal does not show that there was a conspiracy to establish a monopoly either

---

carrier subject to the provisions of this chapter, or any of its officers or agents, to discriminate unjustly in his, its, or their favor as against any other consignor or consignee in the transportation of property, or shall aid or abet any common carrier in any such unjust discrimination, such person or such officer or agent of such corporation or company shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof in any court of the United States of competent jurisdiction within the district in which such offense was committed, be subject to a fine of not exceeding $5,000, or imprisonment in the penitentiary for a term of not exceeding two years, or both, in the discretion of the court, for each offense; and such person, corporation, or company shall also, together with said common carrier, be liable, jointly or severally, in an action to be brought by any consignor or consignee discriminated against in any court of the United States of competent jurisdiction for all damages caused by or resulting therefrom."

of transportation by Pennsylvania or of storage by Merchants, much less that a monopoly was actually attained. There was no monopoly of transportation, for the statistics make it plain that the competing lines in Philadelphia had a large percentage of the business of carrying storage freight. Moreover, Terminal is not here as the representative of the railroads, and may not vindicate their grievances, if grievances there are. More important is the consideration whether there has been a monopoly of storage. There are many warehouses in Philadelphia for the storage of railroad freight. Neither Merchants nor any other company has been able to engross the business or has even attempted to engross it. During the years of the unlawful practices, Merchants' business declined proportionately to the whole, and Terminal's increased, as did also that of other warehouses, so far as the record supplies us with the relevant statistics. Indeed, petitioner does not even claim that by reason of the defendants' acts, it failed to get business that would otherwise have come to it. If there was any claim for such damages at the beginning it was explicitly renounced. What petitioner contends and has contended for is this and nothing more, that to hold and attract customers it had to keep its charges down below the normal rate, diminishing its profit to the extent of the reduction. In a word, its only damages are those resulting, in its view, from the allowances for loading and unloading or like discriminatory acts, and not from any conspiracy transcending these particulars, a conspiracy of which allowances and privileges are a symptom or an incident.

Upon the basis of that evidence the trial judge left it to the jury to say whether Terminal was a sufferer from an unlawful combination in restraint of trade and commerce. The jury found a verdict for $136,125 against both defendants. This verdict was trebled by the court,

with the addition of a counsel fee ($27,000), the whole judgment thus amounting to $437,338.81. There was an appeal to the Circuit Court of Appeals for the Third Circuit where the judgment was reversed. The ground of the reversal was that the decision of the Commission refusing reparation was a bar to any claim for damages against either of the defendants in a suit under the Anti-Trust laws as well as under the Commerce Act. 78 F. (2d) 591. This court granted a writ of certiorari to determine the scope and operation of important acts of Congress.

The order of the Commission denying reparation, though it be assumed to be conclusive evidence in favor of the carrier, is plainly not such evidence for the carrier's confederate. We think it better to rest our judgment on grounds applicable to both defendants. Whether such grounds exist is the question next in order.

*First.* Discriminatory privileges and payments given by a carrier to a consignor or consignee are unavailing without more to make out a combination in restraint of trade or commerce within the meaning of the Anti-Trust Laws. To lead to that result the privileges or payments must be the symptoms or incidents of an enveloping conspiracy with its own illegal ends. In the absence of such a showing a sufferer from discriminatory charges and allowances has his remedy under the Commerce Act for any damage to his business, and that remedy is exclusive against all the parties to the wrong.

Two cases in this court, though not indeed decisive, are apposite and helpful. The first, *Keogh* v. *Chicago & Northwestern Ry. Co.*, 260 U. S. 156, was a suit under the Anti-Trust Laws against railway companies and others who were charged to have combined in establishing uniform rates and thus destroying competition, all to the plaintiff's damage. True the rates had been approved after complaint to the Commission, but this was not

enough, or Keogh so contended. He was entitled in his view to the benefit of competitive rates, quite apart from any finding that the rates established by concerted action were reasonable in amount and without discriminatory effect. In upholding a dismissal of the suit, the court called attention to the provisions of the Commerce Act whereby a remedy in damages was given for rates illegally exacted. "If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings. *Louisville & Nashville R. Co.* v. *Ohio Valley Tie Co.*, 242 U. S. 288. Can it be that Congress intended to provide the shipper, from whom illegal rates have been exacted, with an additional remedy under the Anti-Trust Act? See *Meeker* v. *Lehigh Valley R. Co.*, 162 Fed. 354. And if no remedy under the Anti-Trust Law is given where the injury results from the fixing of rates which are illegal because too high or discriminatory, may it be assumed that Congress intended to give such a remedy where, as here, the rates complained of have been found by the Commission to be legal and while in force had to be collected by the carrier?" 260 U. S. at p. 162. These queries were coupled with a warning of the practical inconvenience attendant on any answer different from the one that they suggest. "If a shipper could recover under § 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors." *Id.* at 163.

A second case pointing the same way is *United States Navigation Co.* v. *Cunard Steamship Co.*, 284 U. S. 474. The suit was for an injunction under the Sherman Anti-Trust Act and the Clayton Act to restrain a group of

steamship companies from continuing a conspiracy in restraint of trade and commerce. The acts charged to be illegal fell within the express prohibitions of the Shipping Act of 1916 as amended, or were in effect, even if not in terms, a component part thereof. 284 U. S. at p. 485; 46 U. S. C., §§ 801, 812, 815, 816, 876. The decision was that the plaintiff must seek redress by application to the Shipping Board. True, the Anti-Trust Laws, since the enactment of the Clayton Act, have been explicit in providing that any one injured by an unlawful combination might have relief by injunction against threatened damage to his business. 15 U. S. C., § 26; *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *Bedford Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37. To this there is an exception where the subject matter of the complaint is a wrong within the jurisdiction of the Interstate Commerce Commission, in which case an injunction, if granted, must be at the instance of the government. 15 U. S. C., § 26; *Central Transfer Co.* v. *Terminal Railroad Assn.,* 288 U. S. 469, 474. The exception does not apply, at all events in terms, to wrongs within the jurisdiction of any other board. Even so, the right to sue, however explicit on its face, was held to have been partially superseded in respect of private suitors by the adoption of the Shipping Act, which as to transactions within its range gave the only remedy available. The conclusion was reinforced by a reference to Keogh's case and to the need for a uniformity difficult of attainment when jurisdiction is divided.

What was said in these opinions is precisely applicable here. If a sufferer from the discriminatory acts of carriers by rail or by water may sue for an injunction under the Clayton Act without resort in the first instance to the regulatory commission, the unity of the system of regulation breaks down beyond repair. *Texas & Pacific Ry. Co.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426; *Interstate*

*Commerce Comm'n* v. *Illinois Central R. Co.* 215 U. S.
452; *Robinson* v. *Baltimore & Ohio R. Co.*, 222 U. S. 506;
*Northern Pacific Ry. Co.* v. *Solum*, 247 U. S. 477, 483;
*Great Northern Ry. Co.* v. *Merchants Elevator Co.*, 259
U. S. 285, 291; and see 15 U. S. C., § 26, construed in
*Central Transfer Co.* v. *Terminal Railroad Assn.*, *supra*.
On the other hand, if the regulatory commission has issued
a "cease and desist" order, an injunction under the Clay-
ton Act is inappropriate and needless. 49 U. S. C., § 16
(7), (8), (12). The same considerations are applicable,
and with undiminished force, where the suit under the
Clayton Act is not for an injunction but for damages.
There too a finding of undue discrimination by the regu-
latory board is a necessary preliminary to a suit against
the carrier. See cases *supra*. Certain then it is that the
Anti-Trust Laws are inapplicable in all their apparent
breadth to carriers by rail or water. A consignor or con-
signee aggrieved by such a wrong must resort to the ap-
propriate administrative agency, at least for many pur-
poses. If he is remitted to the Commerce Act or the
Shipping Act to cancel the illegal preference, may he
pass over those acts and revert to the Clayton or the Sher-
man Act for the purpose of recovering damages? The
Commerce Act like the Shipping Act embodies a remedial
system that is complete and self-contained. It provides
the means for ascertaining the existence of a preference,
but it does not stop at that point. As already shown in
this opinion, it gives a cause of action for damages not
only against the carrier, but also against shippers and
consignees who have incited or abetted. For the wrongs
that it denounces it prescribes a fitting remedy which, we
think, was meant to be exclusive. If another remedy is
sought under cover of another statute, there must be a
showing of another wrong, not canceled or redressed by
the recovery of damages for the wrong explicitly de-
nounced. The opinions of this court in their fair and

natural extension point to that conclusion. *Keogh* v. *Chicago & Northwestern Ry. Co., supra; United States Navigation Co.* v. *Cunard Steamship Co., supra.* The opinions of other federal courts point the same way with equal, if not greater certainty. *United States Navigation Co.* v. *Cunard S. S. Co.,* 50 F. (2d) 83, 86, 89, reviewing the decisions; *Meeker* v. *Lehigh Valley R. Co.,* 162 Fed. 354, 363; *United States* v. *Atchison, T. & S. F. Ry. Co.,* 142 Fed. 176, 184, 185; *Glenn Coal Co.* v. *Dickinson Fuel Co.,* 72 F. (2d) 885, 888. We follow these signposts to the goal they seem to mark.

In thus holding we do not intimate that never in any circumstances can a carrier become a party to a conspiracy in restraint of trade or commerce with liability for treble damages. This has been made plain already. We enlarge on it for greater certainty. Wherein the case is now deficient will be made clearer by example. One may suppose a business of a manufacturer which has assumed the form and size of a monopoly, or if not already at that stage, is well upon the road thereto. Cf. *Standard Oil Co.* v. *United States,* 221 U. S. 1, 51, 61; *United States* v. *American Tobacco Co.,* 221 U. S. 106; *United States* v. *United States Steel Corp,* 251 U. S. 417; *United States* v. *Swift & Co.,* 286 U. S. 106, 116. One may add a situation in which a carrier has knowingly confederated with the owner to preserve such a business or foster it. Whatever liability grows out of that alliance is untouched by this decision. For present purposes we may assume that if such a situation should develop, the carrier would make itself a participant in the monopoly which it had conspired to produce, though its only overt act was a discriminatory rate of carriage. Again, a group of manufacturers, whose business in combination would not amount to a monopoly, might unite among themselves to lay a burden upon commerce by concerted action as to prices. *Swift & Co.* v. *United States,* 196 U. S. 375;

*United States* v. *American Linseed Oil Co.,* 262 U. S. 371; *Eastern States Retail Lumber Dealers' Assn.* v. *United States,* 234 U. S. 600.   If a carrier were to give a preference in furtherance of that conspiracy, it would become a participant therein, or so we may assume, the damages being measured not merely by the consequences flowing from the preference, but by those flowing from the conspiracy in all its comprehensive unity.

None of these assumptions affects the case at hand. For reasons already stated there was no conspiracy to monopolize the storage business to the destruction of Terminal or of others similarly situated.   There was no conspiracy to impose upon that business a burden of any kind, except to the extent that the enjoyment of a preference might increase the opportunities for profit of the warehouse so preferred.   Of any combination more far-reaching, more inclusive in its aims, there is silence in the record after every reasonable inference has been drawn from its pages.   On the contrary, the history of the relation between Pennsylvania and Merchants indicates strongly that the illegal discrimination, far from being a symptom of a larger combination, was the product of a mistake of law, which was shared for many years by the regulatory commission till the decision in McCormick's case laid down another rule.   The mistake does not relieve the carrier from liability for the concession of a privilege which has turned out to be forbidden.   It serves, however, as a reminder that the liability must be kept within reasonable limits, and that a preference innocent in purpose should not be magnified into a token of a circumambient conspiracy.

We conclude that for Merchants as well as for Pennsylvania whatever liability was incurred through the forbidden discrimination was under the act to regulate commerce and not for treble damages.

*Second.*  The case having been submitted to the jury on the theory that apart from the unlawful preference

there was evidence of a conspiracy in restraint of trade and commerce, and the complaint having been framed on that theory and no other, the suit should have been dismissed as to each of the defendants.

The judgment of the Court of Appeals reversing the judgment of the District Court is accordingly

*Affirmed.*

MR. JUSTICE MCREYNOLDS concurs in the result.

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.