**SLICK AIRWAYS, Inc. v. AMERICAN AIR-LINES, Inc. et al.**

No. C 317–50.

United States District Court
D. New Jersey.

June 7, 1951.

Rehearing Denied Aug. 18, 1952.

Minton, Dinsmore & Lane, Trenton, N. J. (Steptoe & Johnson, Arnold, Fortas & Porter, Washington, D. C., of counsel), for plaintiff Slick Airways, Inc.

Morrison, Lloyd & Griggs, Hackensack, N. J., (Debevoise, Plimpton & McLean, New York City, of counsel), for defendant American Airlines, Inc.

Stryker, Tams & Horner, Newark, N. J. (Mayer, Meyer, Austrian & Platt, Chicago, Ill., of counsel), for defendant United Airlines Corp.

Katzenbach, Gildea & Rudner, Trenton, N. J. (Chadbourne, Wallace, Parke & Whiteside, New York City, of counsel), for defendant Transcontinental & Western Air, Inc.

Pitney, Hardin & Ward, Newark, N. J., for defendant Air Cargo, Inc.

FORMAN, Chief Judge.

This is a suit brought under the anti-trust laws of the United States and more particularly sections 1, 2 and 7 of the Sherman Act 15 U.S.C.A. §§ 1, 2 and 15 note[1] and sections 4, 12 and 16 of the Clayton Act, 15 U.S.C.A. §§ 15, 22 and 26.[2] Plaintiff, alleging violations of these Acts by defendants, seeks to recover triple damages in the sum of ten million dollars and to enjoin defendants from further action in violation of the anti-trust laws.

Plaintiff, a corporation, has been engaged in the business of air freight since

---

1. Section 1. "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: * * * Every person who shall make any contract or engaged in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C.A. § 1.

Section 2. "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 15 U.S.C.A. § 2.

Section 7. See 15 U.S.C.A. § 15, footnote 2, infra.

2. Section 4. "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C.A. § 15.

Section 12. "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." 15 U.S.C.A. § 22.

Section 16. "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue: *Provided*, That nothing contained in sections 12, 13, 14–21, 22–27 of this title shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of chapters 1 and 8 of Title 49, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission." 15 U.S.C.A. § 26.

March of 1946, the year of its organization. Since August of 1949 it has held a certificate of public convenience and necessity to act as a common carrier of freight by air issued by the Civil Aeronautics Board (hereinafter called the CAB).

Three of the defendants, American Airlines, Inc., United Airlines, Inc., and Transcontinental & Western Air, Inc., are certificated carriers of passengers, express, mail and freight by air. Defendant Air Transport Association of America [3] is composed of the above defendants and other companies engaged in air transportation and the defendant Air Cargo, Inc. is a corporation whose stock is owned by defendant airlines and other companies engaged in air transportation.

## The Complaint

The gravamen of the complaint is that the defendants and other airlines, since 1946, "have conspired to monopolize, monopolized and attempted to monopolize air freight transportation and have unlawfully contracted, combined, and conspired to restrain trade or commerce among the several states in air freight transportation" with the design of driving the plaintiff and other freight carriers from the business, and that the following means and methods have been utilized in pursuance thereof:

"(a) A deliberate attempt, through predatory rate policies and a process of attrition, 'to waste the resources of the plaintiff and other freight carriers, and to cause them to operate at a substantial loss;

"(b) The abuse of the privilege of intervention and participation in CAB proceedings controlling plaintiff's legal right and authority to engage in the air freight business;

"(c) A campaign of unfair competitive practices designed to appropriate the business;"

The defendants have moved to dismiss the complaint upon the ground that this court lacks primary jurisdiction to hear and determine the matters alleged in the complaint, that the exclusive primary jurisdiction with respect to all such matters has been vested by Congress in the CAB, and that plaintiff fails to state a claim upon which relief can be granted or an injunction issued. It is plaintiff's position principally that the matters raised in the complaint are properly cognizable by this court at this time and do not require further recourse to an administrative board for their decision, since the plaintiff has already invoked the Board's proceedings and the relief it seeks in the form of damages is beyond the authority and power of the Board to grant.

■ The task of determining whether a cause of action has been pleaded herein was not made easier by the unnecessary prolixity of the complaint numbering twenty-three printed pages. In screening the interminable allegations the fundamental rule that on a motion to dismiss a complaint is entitled to be given its most liberal construction was observed to the fullest extent.

Insofar as its applicability to the complaint under consideration is concerned, the doctrine of primary jurisdiction, although enunciated and developed in many cases, presents a matter of great complexity. None of them provides a ready or definitive resolution of the question involved. To a large extent the determining factor will depend upon (to use the expression of Mr. Justice Brandeis in the case of Great Northern Ry. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943, "the character of the controverted question and the nature of the inquiry necessary for its solution." Among other things, it will become necessary to analyze the character of the alleged illegal concerted undertaking by defendants and the acts allegedly committed pursuant thereto and with respect to such undertaking and acts, the scope of power of the CAB, the resort, if any, made to it and the power reserved to the courts under the anti-trust laws.

---

3. On behalf of which a motion to quash service of process is pending.

204

## The Statute

Bearing upon the complaint we note the following provisions of the Civil Aeronautics Act [4] as relevant thereto:

A declaration of policy for the guidance of the CAB is set forth in § 402:

"In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity—

"(a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantage of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;

"(c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;

"(d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;

"(e) The regulation of air commerce in such manner as to best promote its development and safety; and

"(f) The encouragement and development of civil aeronautics."

In the portions of the Act pertaining to economic regulations over air carriers there has been enunciated in a more specific manner types of activity, both permitted and proscribed, and the scope of

the power of the CAB to deal with such activities.

Under § 488(a) consolidations, mergers and acquisitions of control in the aeronautical field are unlawful unless approved by the Board as therein provided.

Section 488(b) sets forth the manner in which any such consolidation, merger or acquisition of control shall be approved by the Board, subject to this limitation upon the power of the Board to grant its approval thereto:

"*Provided,* That the Board shall not approve any consolidation, merger, purchase, lease, operating contract, or acquisition of control which would result in creating a monopoly or monopolies and thereby restrain competition or jeopardize another air carrier not a party to the consolidation, merger, purchase, lease, operating contract, or acquisition of control:".

With regard to violations of § 488(a), § 488(e), provides: "The Board is empowered, upon complaint or upon its own initiative, to investigate and, after notice and hearing, to determine whether any person is violating any provision of subsection (a) of this section. If the Board finds after such hearing that such person is violating any provision of such subsection, it shall by order require such person to take such action, consistent with the provisions of this chapter, as may be necessary, in the opinion of the Board, to prevent further violation of such provision."

With regard to the Board's power over methods of competition in the aeronautical field, § 491 provides: "The Board may, upon its own initiative or upon complaint by any air carrier or foreign air carrier, if it considers that such action by it would be in the interest of the public, investigate and determine whether any air carrier or foreign air carrier has been or is engaged in unfair or deceptive practices or unfair methods of competition in air transportation. If the Board shall find, after notice and hearing, that such air carrier or foreign air carrier is engaged in such unfair

---

4. 49 U.S.C.A. §§ 401–705; sections of the Act will be referred to by the numbered designations in the U.S.C.A. rather than the numbers in the original legislation.

or deceptive practices or unfair methods of competition, it shall order such air carrier or foreign air carrier to cease and desist from such practices or methods of competition."

The Act provides in § 492(a) for the filing with the Board of every agreement affecting air transportation and § 492(b) requires that the Board approve or disapprove such agreements:

"(a) Every air carrier shall file with the Board a true copy, or, if oral, a true and complete memorandum, of every contract or agreement (whether enforceable by provisions for liquidated damages, penalties, bonds, or otherwise) affecting air transportation and in force on the effective date of this section or hereafter entered into, or any modification or cancelation thereof, between such air carrier and any other air carrier, foreign air carrier, or other carrier for pooling or apportioning earnings, losses, traffic, service, or equipment, or relating to the establishment of transportation rates, fares, charges, or classifications, or for preserving and improving safety, economy, and efficiency of operation, or for controlling, regulating, preventing, or otherwise eliminating destructive, oppressive, or wasteful competition, or for regulating stops, schedules, and character of service, or for other cooperative working agreements.

"(b) The Authority shall by order disapprove any such contract or agreement, whether or not previously approved by it, that it finds to be adverse to the public interest, or in violation of this chapter, and shall by order approve any such contract or agreement, or any modification or cancelation thereof, that it does not find to be adverse to the public interest, or in violation of this chapter; * * *."

The exemption of certain agreements from the application of the anti-trust laws is provided in § 494. "Any person affected by any order made under sections 488, 489, or 492 of this chapter, shall be,

and is hereby, relieved from the operations of the 'antitrust laws', as designated in section 12 of Title 15 and of all other restraints or prohibitions made by, or imposed under, authority of law, insofar as may be necessary to enable such person to do anything authorized, approved, or required by such order."

Section 642 sets forth the procedure to be followed with respect to complaints to, and investigations by, the Board regarding matters within the scope of the statute. Paragraph (c) gives the Board power to issue an appropriate order to compel compliance with the provisions of the statute With respect to findings of an unreasonable or discriminatory rate paragraph (d) provides that the Board shall then "determine and prescribe the lawful rate, fare, or charge (or the maximum or minimum, or the maximum and minimum thereof) thereafter to be demanded, charged, collected, or received, or the lawful classification, rule, regulation, or practice thereafter to be made effective: * * *."

Section 647 sets forth the manner by which the Board may obtain judicial enforcement of any of its orders, rules, regulations, etc.

Section 676 limits the exclusiveness of the remedies provided by the statute in the following language: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies."

It is to be observed, at this juncture, that the statute does not endow the Board with power to award damages or reparations for any violation thereof.

### Defendants' Position

Defendants in support of their position that the CAB has exclusive primary jurisdiction over the matters alleged in the complaint rely principally on a long line of cases[5] decided by the United States Su-

---

5. Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553; Baltimore & O. R. R. Co. v. U. S. ex rel. Pitcairn Coal Co., 215 U.S. 481, 30 S.Ct. 164, 54 L.Ed. 292; Robinson v. Baltimore & O. R. R. Co., 222 U.S. 506, 32 S.Ct. 114, 56 L.Ed. 288; Great Northern Ry. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477; Keogh v. Chicago & Northwestern Ry., 260 U.S. 156,

preme Court with reference to other administrative bodies, particularly the Interstate Commerce Commission and the Shipping Board. An examination of these cases lends support generally to defendants' contention that whenever a rate, rule or practice, subject to the sphere of regulation of an administrative agency, is attacked as unreasonable or unjustly discriminatory, the court must stay its hand until there has been a resort to the administrative agency. The rationale underlying this doctrine and reiterated in many cases is two-fold. First the inquiry being essentially one of fact and of discretion in technical matters, uniformity can be secured only if the determination is left to the administrative body. Secondly, the resolution of intricate and complicated issues in a technical field can be fully evaluated only by a body of experts, such as an administrative tribunal specially equipped and experienced to deal with such matters. See Great Northern Ry. v. Merchants Elevator Co., supra, 259 U.S. at page 291, 42 S.Ct. 477.

## Discussion

The statutes creating the various administrative agencies have failed, in many instances, to define and indicate the line of demarcation between the functions of the court and the administrative tribunals, particularly as regarding the application of remedies outside the scope of the power of the latter. In this area the courts, when confronted with the necessity of making a workable allocation of business between themselves and the agencies, have applied the doctrine of primary jurisdiction with flexibility. Cf. Civil Aeronautics Board v.

Modern Air Transport, 2 Cir., 179 F.2d 622, 625.

The statute creating the CAB and enunciating the scope of its powers and duties likewise fails to delineate this dichotomy of function between the Board and the courts and thus the courts are confronted with drawing the distinction.

We have considered the many cases and arguments advanced by counsel for all parties supporting and opposing the jurisdiction of this court with regard to the present suit. We are mindful of the admonition of Circuit Judge Augustus N. Hand when he said, with reference to the Shipping Act, 46 U.S.C.A. § 801 et seq., "that every reason of policy and convenience should prompt the courts to 'take arms against a sea of troubles' by requiring resort to the Shipping Board in situations like the present." [6] But, the difficulty of the task that may confront a court cannot alone serve as a basis for the imposition of the doctrine of primary jurisdiction. See Circuit Judge Clark in Civil Aeronautics Board v. Modern Air Transport, supra, 179 F.2d at page 625. Viewing, as I must, this complaint in its most favorable light, I am persuaded that this court has jurisdiction of the instant suit upon the reasoning that follows.

The essence of the complaint is that the defendants, in violation of the anti-trust laws, have conspired to exclude plaintiff from the field of air freight transportation. Normally, jurisdiction of such a charge rests with the courts under the anti-trust laws.[7] To a certain extent the anti-trust laws have been superseded by legislation regulating specific fields of activity.[8] But, regulated industries are not

43 S.Ct. 47, 67 L.Ed. 183; U. S. Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408; Central Transfer Co. v. Terminal Railroad Association of St. Louis, 288 U.S. 469, 53 S.Ct. 444, 77 L.Ed. 899; Terminal Warehouse Co. v. Pennsylvania R. Co., 297 U. S. 500, 56 S.Ct. 546, 80 L.Ed. 827; General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361; Armour & Co. v. Alton R. Co., 312 U.S. 195, 61 S.Ct. 498, 85 L.Ed. 771; State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65

S.Ct. 716, 89 L.Ed. 1051; Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132.

6. U. S. Nav. Co. v. Cunard S. S. Co., 2 Cir., 50 F.2d 83, 91.

7. See 15 U.S.C.A. §§ 4, 15.

8. For example: Shipping Act, 46 U.S.C.A. § 801 et seq., U. S. Nav. Co., Inc., v. Cunard S. S. Co., 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408; Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., Terminal Warehouse Co. v. Pennsylvaia R. Co., 297 U.S. 500, 514, 56 S.Ct. 546, 80 L.Ed. 827.

per se exempt from the Sherman Act, U. S. v. Borden Co., 308 U.S. 188, 198 et seq., 60 S.Ct. 182, 84 L.Ed. 181 and a conspiracy to drive a competitor out of business is included within the sweep of the anti-trust laws. William Goldman Theatres, Inc., v. Loew's, Inc., 3 Cir., 150 F.2d 738, 743; cf. State of Georgia v. Penn. R. Co., 324 U.S. 439, 456, 65 S.Ct. 716, 89 L.Ed. 1051. With regard to the type of relief prayed for in the form of damages, there appears to be nothing in the Civil Aeronautics Act which indicates a suspension of the anti-trust laws. Hawaiian Airlines v. Trans-Pacific Airlines, D.C., 78 F.Supp. 1, 8. Actually, § 676, supra, specifically provides that "Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies." This is not to be construed, however, as vitiating the primary jurisdiction rule whenever applicable. Texas & Pacific Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 446, 27 S.Ct. 350, 51 L. Ed. 553. But we reserve for the present the question of whether as a prerequisite to proving the means and methods allegedly used in furtherance of the alleged conspiracy there is required a primary recourse to the CAB.

It is the contention of the defendants that the alleged combinations and conspiracies set forth in the complaint amount to agreements which fall within the Board's jurisdiction under § 492, supra, and that the Board has the power to approve combinations which would otherwise violate the anti-trust laws in order to promote the special policies applicable to air transportation. Thus, they maintain that the CAB has exclusive primary jurisdiction over such conspiracies and that the court cannot act upon the matter until the Board has exercised its jurisdiction, and cite the case of U. S. Navigation Co., Inc., v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L. Ed. 408, as completely dispositive of this point.

█ I cannot concur with the suggestion that a conspiracy to drive a competitor out of business, as alleged here, is the type of agreement encompassed within the stat-ute and subject to the primary jurisdiction of the CAB for approval or disapproval and for possible immunity from the anti-trust laws. Further I cannot accept the thesis that since the CAB has the power to approve agreements or combinations which might otherwise violate the anti-trust laws, it would be necessary first to prove before the CAB a conspiracy to restrain trade and then have the Board disapprove the conspiracy before a litigant could seek redress for damages in the courts. Such a conspiracy being inherently secretive and furtive in nature is not the type of subject matter which would be dealt with by an order made under §§ 488, 489 or 492 so as to be relieved from the operation of the anti-trust laws. See § 494. Cf. U. S. v. Far Eastern Conference, D.C.N.J., 94 F.Supp. 900, 903.

█ The defendants misconceive the nature of the complaint by confusing the means allegedly used with the result to be achieved. They view the complaint as alleging combinations or conspiracies to waste the resources of the plaintiff through predatory rate policies, to abuse the privilege of intervention in CAB proceedings, and to conduct a campaign of unfair competitive practices which amount to contracts and agreements within the purview of § 492. It is in this that they fall into error for these alleged acts rather constituted the means and methods by which the defendants conspired to drive the plaintiff out of business in violation of the anti-trust laws. As the Supreme Court said in American Tobacco Co. v. United States, 328 U.S. 781, 809, 66 S.Ct. 1125, 1139, 90 L. Ed. 1575: "It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy.

Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words. United States v. Schrader's Son, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471."

The instant suit is to be distinguished from cases such as Terminal Warehouse Co. v. Pennsylvania R. Co., 297 U.S. 500, 56 S.Ct. 546, 547, 80 L.Ed. 827, where the plaintiff sought to recover under the antitrust laws for an unlawful combination in restraint of trade but where the court held that the gist of the complaint was merely discrimination in rates and the allowance of forbidden preferences, wrongs for which the Interstate Commerce Act provided a "fitting" and "exclusive" remedy and which necessitated that resort should first be had to the appropriate administrative body. In that case the court noted that "no secret was made of the existence of this contract or of any of the others." On the contrary, the substance of the whole arrangement was set forth in the tariffs of the railroad filed with the Interstate Commerce Commission and open to the public. The plaintiff, however, not satisfied to proceed under the Commerce Act brought suit under the Sherman and Clayton Acts but was unable to prove any loss that would not be provable in equal measure under the Commerce Act upon a claim for reparation. Its only damages were those resulting from the discriminatory acts and not from any conspiracy transcending these particulars. It was unable to show a conspiracy to establish a monopoly. Justice Cardozo stated: "Discriminatory privileges and payments given by a carrier to a consignor or consignee are unavailing without more to make out a combination in restraint of trade or commerce within the meaning of the antitrust laws. To lead to that result, the

privileges or payments must be the symptoms or incidents of an enveloping conspiracy with its own illegal ends. In the absence of such a showing, a sufferer from discriminatory charges and allowances has his remedy under the Commerce Act for any damage to his business, and that remedy is exclusive against all the parties to the wrong." 297 U.S. at page 511, 56 S.Ct. at page 550.

After discussing the applicability of the case of Keogh v. Chicago & Northwestern Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 and the Cunard case, Justice Cardozo commented:

"Certain then it is that the Anti-Trust Laws are inapplicable in all their apparent breadth to carriers by rail or water. A consignor or consignee aggrieved by such a wrong must resort to the appropriate administrative agency, at least for many purposes. If he is remitted to the Commerce Act or the Shipping Act to cancel the illegal preference, may he pass over those acts and revert to the Clayton or the Sherman Act for the purpose of recovering damages? *The Commerce Act like the Shipping Act embodies a remedial system that is complete and self-contained.* It provides the means for ascertaining the existence of a preference, but it does not stop at that point. As already shown in this opinion, it gives a cause of action for damages not only against the carrier, but also against shippers and consignees who have incited or abetted. *For the wrongs that it denounces it prescribes a fitting remedy which, we think, was meant to be exclusive. If another remedy is sought under cover of another statute, there must be a showing of another wrong, not canceled or redressed by the recovery of damages for the wrong explicitly denounced.* The opinions of this court in their fair and natural extension point to that conclusion. (Cases cited.) We follow these signposts to the goal they seem to mark.

"*In thus holding, we do not intimate that never in any circumstances can a carrier become a party to a conspiracy in restraint of trade or commerce with liability for treble damages.* This has

been made plain already. * * *" 297 U.S. at pages 514, 515, 56 S.Ct. at page 551. Italics supplied.

▮ It is generally recognized that exemption from the anti-trust laws must be secured in the precise manner and method prescribed by Congress. U. S. v. Socony Vacuum Oil Co., 310 U.S. 150, 226, 60 S.Ct. 811, 84 L.Ed. 1129.[9] The mere fact that a procedure is authorized whereby an immunity may be obtained does not require the imposition of primary jurisdiction of the CAB under the circumstances alleged in the complaint before us. See U. S. v. Borden, supra. Such an exemption may not be construed as a restriction on the jurisdiction of this court. U. S. v. Far Eastern Conference, supra, 94 F.Supp. at pages 902, 903.

▮ Of course, an agreement approved by the Board pursuant to the authority conferred by statute and within the terms of prescribed immunity would be a defense to a suit under the Sherman or Clayton Acts to the extent that the plaintiff sought to show as illegal conduct that which was approved by the Board. But it is elementary that repeals by implication are not favored. Only a clear repugnancy between the old law and the new results in the former giving way and then only pro tanto to the extent of the repugnancy. State of Georgia v. Pennsylvania R. Co., supra, 324 U.S. at page 456, 65 S.Ct. 716;[10] U. S. Alkali Export

9. See a related expression by Honorable Francis Biddle, The Attorney General of the United States, as follows:

"October 31, 1944.
"The Secretary of State.

"My dear Mr. Secretary: In your letter dated October 30, 1944, you requested my opinion on the following question:

" 'Would the United States anti-trust laws apply to conference agreements (with respect to rates, schedules, services, etc.) entered into between United States air carriers, and between United States air carriers and foreign air carriers, and designed to control or prevent competition in air transportation between the United States and foreign countries in a manner which would be prohibited by the anti-trust laws were purely domestic commerce involved?' "

* * * * *

"The Shipping Act of 1916, 39 Stat. 728, 46 U.S.C.A. § 801, provides a procedure whereby steamship companies may obtain exemption from the anti-trust laws for agreements limiting competition. In the absence, however, of strict compliance with the procedure prescribed in this act, agreements that limit competition between steamship lines are subject to the provisions of the Sherman Act.

"The rules of law laid down in the decisions that have been cited are applicable to the question asked by your letter. Except to the extent that Congress has specifically provided exemptions, agreements entered into between United States air carriers, or between United States air carriers and foreign air carriers, that are designed to control or to prevent competition in air transportation between the United States and foreign countries,

are subject to the provisions of the anti-trust laws to the same degree as are similar agreements between domestic air carriers. Furthermore, agreements of foreign air carriers, in which no United States carrier is involved, are subject to the anti-trust laws if those agreements affect the foreign commerce of the United States.

"Section 412 of the Civil Aeronautics Act, 52 Stat. 973, 49 U.S.C.A. § 492, provides that certain agreements between air carriers may be approved by the Civil Aeronautics Board subject to the standards prescribed by Congress in the act. Section 414 of the act provides that if the agreements are so approved by the Board, they are exempted from the application of the anti-trust laws. This exemption, however, must be secured in the precise manner and method presented by Congress. United States v. Socony-Vacuum Oil Company, 310 U.S. 150, 226, [60 S.Ct. 811, 84 L.Ed. 1129]. I call your attention to the fact that the exemption provided by the Civil Aeronautics Act is limited to agreements to which a United States air carrier is a party. No procedure is provided for giving immunity to agreements made by foreign air carriers among themselves * * *." 40 Op.Atty.Gen. 335, 337–338.

10. In this case the Supreme Court declined to apply the doctrine of primary jurisdiction to an alleged rate-fixing combination even though the rates themselves could not be questioned in view of the fact that they were on file with the Interstate Commerce Commission and the carriers were under an obligation to charge them. The Court in that case said:

210

Ass'n v. U. S., 325 U.S. 196, 205, 206, 65 S.Ct. 1120, 89 L.Ed. 1554. The power of the CAB over air transportation in interstate commerce is not disturbed by the retention of the jurisdiction of the courts to enforce the anti-trust laws. Cf. Pennsylvania Water & Power Co. v. Consolidated Gas Electric L. & P. Co., 4 Cir., 184 F.2d 552.

### The Cunard Case

Since the Cunard case, supra, is a more or less continuous thread in the fabric of the contentions in this case it deserves a full and careful analysis. In it a purported conspiracy to restrain trade in violation of the Sherman Act, similar in many respects to the one alleged here, was held to be a matter subject to the "exclusive preliminary jurisdiction" [284 U.S. 474, 52 S.Ct. 251] of the Shipping Board. The Court conceded that the complaint stated a cause of action under the Sherman Act unless the Shipping Act, 49 U.S.C.A. § 801 et seq. stood in its way. It noted that the Shipping Act was a comprehensive measure bearing a relation to common carriers by water substantially the same as that borne by the Interstate Commerce

"The relief which Georgia seeks is not a matter subject to the jurisdiction of the Commission. Georgia in this proceeding is not seeking an injunction against the continuance of any tariff; nor does she seek to have any tariff provision cancelled. She merely asks that the alleged rate-fixing combination and conspiracy among the defendant-carriers be enjoined. As we shall see, that is a matter over which the Commission has no jurisdiction. And an injunction designed to put an end to the conspiracy need not enjoin operation under established rates as would have been the case had an injunction issued in Central Transfer Co. v. Terminal R. Ass'n, supra.

"These carriers are subject to the anti-trust laws. * * *" 324 U.S. at pages 455, 456, 65 S.Ct. at page 725.

Following the Georgia decision, Congress amended the Interstate Commerce Act by enacting the Reed-Bulwinkle Act, 49 U.S.C.A. § 5b, which gave the Commission power to approve certain types of agreements between railroads and immunize them from the operation of the anti-trust laws. But, Congress has failed even there to make it definitive that this

Act to carriers by land. After tracing the development of the rationale of the "preliminary" jurisdiction rule, see page 205, 107 F.Supp. supra, the Court showed by a section by section analysis of the Shipping Act that the Act covered the dominant facts alleged in that case as constituting a violation of the anti-trust acts. Section 22, it observed, empowered the Board to direct payment of reparations for injuries caused by violations of the Act. The court then stated: "A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions, or are so interrelated with such charges as to be, in effect, a component part of them; and *the remedy is that afforded by the Shipping Act, which to that extent supersedes the anti-trust laws.* Compare Keogh v. C[hicago] & N.W. Ry. Co., supra, 260 U.S. at page 162, 43 S.Ct. 47, 49, 67 L.Ed. 183. The matter therefore is within the *exclusive preliminary jurisdiction* of the Shipping Board."[11] 284 U.S. at page 485, 52 S.Ct. at page 250. Italics supplied.

power of the Commission confers upon it exclusive primary jurisdiction over *all* complaints alleging conspiracy in restraint of trade and in violation of the anti-trust laws. In a House Committee Report on this subject, H.R. 1100, U. S. Code Congressional Service, 80th Congress, 2d session, 1948, p. 1848, there is this comment:

"The bill leaves the antitrust laws to apply with full force and effect to carriers, so far as they are now applicable, except as to such joint agreements or arrangements between them as may have been submitted to the Interstate Commerce Commission and approved by that body upon a finding that, by reason of furtherance of the national transportation policy as declared in the Interstate Commerce Act, relief from the antitrust laws should be granted."

11. See Justice Cardozo's reference to this theory in Terminal Warehouse Co. v. Pennsylvania R. Co., supra, quoted at pages 208 and 209 herein. See also Keogh case, supra, 260 U.S. at page 163, 43 S.Ct. 47.

In view of the scope of the Shipping Act it becomes apparent why the failure to file an agreement in the form of a conspiracy to restrain competition with the Board under § 15 of that Act would not permit a litigant to bypass the Board and seek relief in the courts under the anti-trust laws. As the Court stated: "But a failure to file such an agreement with the board will not afford ground for an injunction under section 16 of the Clayton Act at the suit of private parties, whatever, in that event, may be the rights of the government, since the maintenance of such a suit, being predicated upon a violation of the anti-trust laws, depends upon the right to seek a remedy under those laws; a right which, as we have seen, does not here exist. *If there be a failure to file an agreement as required by section 15, the Board, as in the case of other violations of the act, is fully authorized by section 22, supra, to afford relief upon complaint or upon its own motion.* * * *" 284 U.S. at page 486, 52 S.Ct. at page 251. Italics supplied.

In the same context may be viewed the Court's assertion that the Board would not be stripped of its jurisdiction even though the agreement could not legally be approved, for as the Court added: "In any event, it reasonably cannot be thought that Congress intended to strip the Board of its primary original jurisdiction to consider such an agreement and 'disapprove, cancel, or modify' it, because of a failure of the the contracting parties to file it as section 15 requires. *A contention to that effect is clearly out of harmony with the fundamental purposes of the act, and specifically with the provision of section 22 authorizing the Board to investigate any violation of the act upon complaint or upon its own motion and make such order as it deems proper.* And whatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the Board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of such hearing and determination would be to usurp that authority. * * *" 284 U.S. at page 487, 52 S.Ct. at page 251. Italics supplied.

The Cunard case does not stand for the proposition that an administrative body has remedial jurisdiction to determine the existence of the conspiracy under the anti-trust laws. It stands for the proposition that to the extent a complaint alleging a conspiracy under the anti-trust laws also sets forth a violation of another regulatory act under which an enforcing administrative body is established and where a complete remedy has been provided in said act, then the administrative body established thereunder has exclusive primary jurisdiction over such a matter, even though the facts alleged may state a conspiracy under the anti-trust laws, and to that degree the anti-trust laws are thus superseded.

I do not view the Cunard case as authority for the proposition that a complaint alleging a conspiracy to restrain competition in air freight in violation of the anti-trust laws must initially be referred to the CAB since no supersession of the anti-trust laws is contained in the Civil Aeronautics Act as has been held to exist under the Shipping Act. See, contra, the case of S.S.W., Inc., v. Air Transport Ass'n of America, et al., D.C.–D.C., 91 F.Supp. 269. And if it is contended that, in view of the power of the CAB under § 491 to determine "unfair or deceptive practices" and "unfair methods of competition" in air transportation, Congress intended to vest in the CAB power to find all facts with respect to anti-trust laws prior to the submission of such matters to the courts, it is clear that even if the conspiracy to drive a competitor out of business is viewed in this category, the CAB by its power to issue a cease and desist order can effect only present and future acts. It cannot provide remedial relief for past injuries resulting to a victim of the conspiracy to exclude a competitor in violation of the anti-trust laws. The inadequacy of such a remedy is apparent.[12] Moreover, if the

---

12. Insofar as the allegations of the complaint constitute both violations of the anti-trust laws and unfair competitive practices for which the CAB is empowered to issue cease and desist orders, if the complaint herein appealed for injunctive re-

CAB, under § 491 were to issue such a cease and desist order against such conduct, its findings would be an adjudication only that it had found .such conduct to constitute unfair, competitive practices but it would not be a holding that they constituted a "conspiracy" to restrain competition in violation of the anti-trust laws.

Mr. Justice Black, in characterizing the Federal Trade Commission and Sherman Act remedies as cumulative and not mutually exclusive in Federal Trade Comm. v. Cement Institute, 333 U.S. 683, at page 694, 68 S.Ct. 793, at page 800, 92 L.Ed. 1009, stated: "It has long been recognized that there are many unfair methods of competition that do not assume the proportions of Sherman Act violations. (Cases cited). Hence a conclusion that respondents' conduct constituted an unfair method of competition does not necessarily mean that their same activities would also be found to violate § 1 of the Sherman Act."

■■■ It would be an anomaly to think that Congress with its multitude of experience in its development of the Interstate Commerce Act and the Shipping Act, in legislating controls over the newer air transportation in the form of the Civil Aeronautics Act should fail to provide relief by way of damages or reparations for wrongs equivalent to violations of the anti-trust laws and intend that primary jurisdiction over a conspiracy violative of the anti-trust laws, as alleged in the instant suit, should remain in the CAB. It would seem more probable that Congress purposely withheld from the Board power to award damages or reparations for violations of the Civil Aeronautics Act. Cf. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 71 S.Ct. 692 (Justice Frankfurter dissenting), a recent case dealing with the Federal Power Act, 16 U.S.C.A. § 791a et seq. This, of itself, would not confer upon the courts power to entertain proceedings for recovery of dam-

ages or reparations and if the instant complaint merely sought to recover damages under the Civil Aeronautics Act on account of unfair competitive practices committed, or unreasonable rates charged, by defendants, I would agree that it would not state a cause of action in this court. Montana-Dakota Utilities Co. v. Northwestern Public Service Co., supra, 71 S.Ct. 692; also cf. dissenting opinion 71 S.Ct. at page 697. In this suit, the source of the causes of action is not the Civil Aeronautics Act but the anti-trust laws, and the prescription of the latter statutes is a standard for the courts to apply subject, as has been noted, to certain exceptions in the Civil Aeronautics Act. The prescription is not a matter which Congress has deemed to be within the special competence of the CAB, nor will it impose on the court alien responsibilities or duties it is not equipped to fulfill.[13]

### Means and Methods of Conspiracy

As has been previously noted the plaintiff asserts that the alleged conspiracy was consummated by various means and methods which it classified under three categories. At this stage of the proceedings we must investigate the complaint to see whether on its face it is apparent that in proving the said means and methods recourse will be necessary to the CAB since to the extent that it has primary jurisdiction over such matters, the court will not exercise any power to pass upon the charges.

■■■ In paragraphs 30 through 49 of the complaint the plaintiff sets forth numerous allegations relating to rate policies by defendants which it contends were utilized for the purpose of accomplishing illegal objectives proscribed by the anti-trust laws. Many of these allegations relate to the fixing by defendants of freight rates below costs. It is well settled that there must be a preliminary resort to the administrative tribunal whenever a rate is attacked as unlawful or as unjustly discriminatory.

lief only, whether the plaintiff would then be confined to the jurisdiction of the CAB is a question we need not determine since the complaint calls for both damages and injunctive relief.

13. There appears no necessity to discuss at length the many other cases cited by both parties to this litigation which point merely in abstract fashion toward the question with which we are here confronted.

Great Northern R. Co. v. Merchants Elevator Co., supra. The determination of what are fair and reasonable rates in air freight transportation is a matter vested in the CAB, and it is not the function of the court to interject itself into this technical field. However, an examination of the complaint indicates that some resort to the CAB with respect to these matters has been had (complaint, pars. 39–41, and 44–46), and that the Board has allegedly made some findings and issued a minimum rate order which established a formula for minimum rates in air freight. Admittedly, the complaint does not set forth with a desired particularity the findings of the CAB which allegedly support the plaintiff's contentions, but any shortcomings in this respect may be cured by amendments which in the federal courts are customarily allowed with great liberality, Rule 15, Federal Rules of Civil Procedure and see annotations to rule in 28 U.S.C.A. Also it is not clear at this stage of the case whether the Board's findings will provide an adequate basis from which further proof may be adduced.[14] But, the allegations concerning predatory rates must be considered with relationship to all of the other allegations for the purpose of determining whether a cause of action is made out in the complaint based on a conspiracy under the anti-trust laws to oust the plaintiff from the air freight industry and so monopolize it and restrain trade in it.

■ This court does not feel that taking all of the allegations of the complaint to be true, as it must on this type of motion, that the averments as to rate policies undertaken in pursuance of the conspiracy, exhibit on their face, such a lack of requisite administrative recourse as to foreclose their admissibility in court for the purpose of proving the conspiracy.

■ Plaintiff contends that as part of the plan to drive it out of the air freight industry defendants abused their privilege to intervene in CAB proceedings by their efforts to block and delay the issuance of a Certificate of Convenience and Necessity to the plaintiff to act as a common carrier, the issuance of which certificate it alleges was "an absolute prerequisite to plaintiff's achieving its objectives in the freight business." Defendants' alleged efforts to block certification included "a well-planned campaign of opposition before the Board" which resulted in "65 days of hearing, 35,000 pages of testimony and briefs before the examiners, a year's study by the examiners, * * * and finally, three and a half years after the application was filed, a decision which the defendants have now

---

14. In the opinion of the CAB on the Air Freight Investigation, Docket No. 1705 et al., decided April 21, 1948, there are included among the findings, the following:

"We find—1. That the form which present competition among respondents has taken has resulted and will result in unduly low, depressed and noncompensatory rates and charges for the transportation of freight by air, and that these practices have resulted, and will result, in unsound economic conditions in the air freight industry within the United States;

"2. That the rates and charges in effect for, and proposed by, many respondent air carriers are unjustly and unreasonably low, and, as a result the ability of such respondents to provide adequate and efficient transportation of property by air has been impaired, and, unless the causes of such conditions be removed, will be further impaired or may be destroyed;

"3. That, on account of the foregoing, conditions, respondents as a whole, and many respondent carriers in particular, are now conducting their air freight operations within the United States at a substantial operating loss, and the rates now in effect and proposed are not sufficient to meet the need of each air carrier for revenues sufficient to enable such air carrier under honest, economical, and efficient management to provide safe, adequate, and efficient air carrier service;

* * * * * * *

"7. That the lawful minimum rates and charges to be demanded, charged, collected, or received for the transportation of property by air in the United States (except for property carried in the air express service over the lines of the certificated air carriers, pursuant to an exception order of the Board shall be (1) 16 cents per ton-mile for the first 1,000 ton-miles in any one shipment, and (2) 13 cents per ton-mile for all ton miles in excess of 1,000 ton-miles in any one shipment;"

appealed to the United States Court of Appeals of the District of Columbia Circuit", as well as the dissemination of false and misleading propaganda and other similar tactics in the public relations field. None of these matters alleged would seem to require any initial determination by the Board even though the Board may have exclusive control over its own procedures for the nature of the question is not that plaintiff attacks the administrative processes in the procedural field, but that defendants have used the processes of the CAB as instrumentalities with which to effect the conspiracy. While it may be questioned whether any of this alleged activity by defendants of itself constituted illegal conduct, it is fundamental, as previously noted, that legal means may be utilized to accomplish the unlawful objective of conspiracy, American Tobacco Co. v. U. S., supra, 328 U.S. at page 809, 66 S.Ct. 1125, 90 L.Ed. 1575, and this court cannot deprive the plaintiff of its right to attempt to prove that these alleged acts were part of the total acts undertaken to effectuate the alleged conspiracy.

 The last category of means and methods pursued by the defendants in furtherance of the alleged conspiracy is denominated as "Unfair Competitive Practices". In view of the CAB's power to determine whether any air carrier has been engaged in unfair methods of competition and to issue a cease and desist order thereon, § 491, the court would not have jurisdiction, absent a preliminary finding by the CAB, to determine whether the alleged competitive practices were unfair, since what might be unfair competitive practices, in any unregulated industry could be viewed by the CAB as permissible.[15]

However, in view of our previous statement that the illegality of the practice is not a prerequisite to proof of a conspiracy, it would appear that the plaintiff would have the right to prove, for example, that defendants threatened plaintiff's customers with serious business injury (complaint, paragraph 60(b)) and circulated to plaintiff's customers rumors and reports concerning plaintiff (complaint, paragraph 60(c)) not for the purpose of showing that they were unfair competitive practices, but as acts in furtherance of the alleged conspiracy. It may be that these acts may ultimately appear inconsequential and of little weight toward the proof of the conspiracy, but, we cannot say at this juncture that, when viewed in the totality of all of the allegations, the complaint fails to state an apparent, properly cognizable cause of action.

It is not intended by the foregoing discussion to preclude from further consideration the objections raised by the defendants should the occasion present itself after the issues for trial have been more fully crystallized, but in view of the complicated nature of the questions involved, we do not feel that the defendants have sustained their burden of showing that plaintiff should be summarily foreclosed, at this stage, from its day in court.[16]

An order should be settled in conformity with this opinion.

### On Rehearing

The defendants have moved for a rehearing of their motion to dismiss the complaint herein on the ground that since the filing of the opinion in this action the United States Court of Appeals for the District of Columbia Circuit, in the case of S. S. W., Inc., v. Air Transport Association of America, 89 U.S.App.D.C. 273, 191 F.2d 658, rendered a conflicting opinion in a similar proceeding.[1] In that case the Court of Appeals reversed the judgment of the

---

15. For example paragraph 60a of the complaint alleges that "Defendants have sought to capture plaintiff's customers (a) Through use of unlawful rebates and unlawful rate reductions." Except as related to the prior findings by the Board, the plaintiff could not show the illegality of the rebates or rate reductions and even the denomination of a rate practice as constituting a rebate or reduction may require prior determination by the Board.

16. See Judge Joyce's opinion in McClellan v. Montana-Dakota Utilities Co., D.C., 95 F.Supp. 977, 979.

1. Cross applications for writs of certiorari were denied by the United States Supreme Court on May 26, 1952. 343 U.S. 955, 72 S.Ct. 1049.

District Court, 91 F.Supp. 269, which had dismissed the complaint as being within the primary jurisdiction of the Civil Aeronautics Board and ordered the District Court to retain jurisdiction of the suit while the plaintiff initially pursued its available administrative remedies before the Board.

Judge Bazelon, speaking for the majority of the court stated that until' the Board has had an opportunity to act upon the allegations of the complaint injunctive relief in the District Court is unavailable and that to the extent that various practices, agreements, methods of competition, etc., would be determined by the Board to be authorized or permissible under the Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq., no injunctive relief under the anti-trust laws would be available at any time.

However, the court acknowledged the difficulties inherent in accommodating the conflicting statutory schemes of the antitrust laws and the Civil Aeronautics Act and recognized that the Board could, at most, grant the plaintiff "prospective" relief only in the form of a cease and desist order but that it had no authority to award damages.

Referring to the latter aspect, he said:

"The prayer for treble damages under the antitrust laws raises a different problem. The Civil Aeronautics Act, unlike the Interstate Commerce Act and the Shipping Act, does not authorize the award of damages by the Board for violation of its provisions. Where specific damage provisions are contained in regulatory statutes, it has been held that there may be no recovery of treble damages under the antitrust laws. (27) And this even in a statute such as the Interstate Commerce Act which contains a clause saving all preexisting remedies at common law or by statute. Here, however, we have both a saving clause, which provides that 'Nothing contained in this Act shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies' (28) and a statute which conspicuously makes no provisions for damages. Reading the saving clause in the light of congressional failure to provide a remedy for damages in the Civil Aeronautics Act, we conclude that Congress did not intend to deprive an air carrier of its right to seek treble damages for violations of the antitrust laws. This accords with the Supreme Court's determination that it could grant injunctive relief under the antitrust laws against a combination of railroads under circumstances where the Interstate Commerce Commission was not authorized to grant comparable relief. (29)

"We do not intend to intimate that appellant may recover damages for appellees' violation of the Civil Aeronautics Act. Treble damages may be obtained only for injuries to business and property resulting from action forbidden by the *antitrust laws*. And the District Court rather than the Board, is the forum in which the latter issue must be resolved. What we are saying is that the same set of facts may give rise to both a violation of the Civil' Aeronautics Act and a violation of the antitrust laws. Although the second does not necessarily follow from the first but is bottomed upon its own statutory standards, the antitrust remedy of treble damages is not defeated by the fact that the Civil Aeronautics Act is also violated. * * *" 191 F. 2d at pages 663, 664.

"27. Terminal Warehouse [Co.] v. Pennsylvania R. Co., 297 U.S. [500], at page 514, 56 S.Ct. [546], at page 551 [80 L.Ed. 827]; U[nited] S[tates] Navigation Co. v. Cunard S. S. Co., 284 U.S. [474], at pages 484–485, 52 S.Ct. [247], at page 250, 76 L.Ed. 408; Keogh v. Chicago & N. W. Ry. Co., 260 U.S. [156], at pages 163–164, 43 S.Ct. 47, 67 L.Ed. 183."

"28. § 1106 of the Civil Aeronautics Act, 49 U.S.C.A. § 676."

"29. [State of] Georgia v. Pennsylvania R. Co., 324 U.S. [439], at page 455, 65 S.Ct. [716], at page 725, 89 L. Ed. 1051."

Nevertheless, Judge Bazelon concl'uded upon the authority of General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 423, 60 S.Ct. 325, 84 L.Ed. 361, that the court should stay its hand pending the conclusion of an appropriate administrative proceeding since an administrative problem, committed to the Board, was involved.

Judge Clark, while concurring with the majority that the decision of the District Court should be reversed and remanded, differed with his colleagues as to its disposition upon remand. He noted that the Civil Aeronautics Act makes no provision for damages and that the majority agreed that the District Court had jurisdiction to hear the complaint with respect to damages. Consequently, the reason for the application of the doctrine of primary jurisdiction being lacking, Judge Clark commented that "the conclusion, it seems, is inescapable that the appellant should not be required to perform the useless task of making the request before the Civil Aeronautics Board."

Defendants also asserted that the Cunard case [2] as well as the S. S. W. case stand for two principles not recognized by this court in its opinion, namely:

"(1) That in private antitrust actions the means and methods alleged are an essential part of the cause of action and must be considered in determining 'the nature of the complaint'; and

"(2) That where the question of primary jurisdiction is raised in such actions, it is resolved by a comparison of the entire subject-matter of the complaint, including the means and methods, with the regulatory statute."

It is submitted that these principles were not ignored and that the instant complaint was not defined in terms of the purpose of the alleged conspiracy only without regard to the means and methods allegedly used to accomplish the purpose. This point was treated at length in the original opinion

and I adhere to the views expressed therein. I have indicated there not that the means and methods are unimportant in determining the extent to which we must have recourse to the primary jurisdiction of an administrative body (See opinion, 107 F.Supp. 212) but rather that the utilization of "legal" means and methods in furtherance of a proscribed conspiracy in a regulated industry does not per se insulate and immunize the conspirator from the anti-trust laws where they are the symptoms or incidents of an enveloping conspiracy with illegal ends, and that therefore a court can have jurisdiction over an illegal conspiracy even though effectuated by legal means and methods. See State of Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051.

I am still unpersuaded at this stage of this litigation that the accommodation of the two statutes and remedial provisions thereof would be better served by staying the proceedings in this case and remitting the plaintiff to the Board for the resolution of administrative problems. The heart of the complaint in this proceeding is that plaintiff has suffered monetary damage [3] by reason of defendants' past activity in violation of the anti-trust laws, the remedy for which, in damages, is indisputably beyond the power of the Civil Aeronautics Board. The doctrine of the exhaustion of administrative remedies can therefore have no application here. But beyond this there do not presently appear administrative problems which must be committed to the Board for its determination. The practice of which plaintiff principally complains is that of predatory rate policies, a matter which has previously been before the Board upon extended hearings and has been the subject of findings and prospective relief (See opinion, 107 F.Supp. 213).

It should be noted that the S. S. W. case differs from the instant case in this respect since the opinion in that case indicates that no recourse of any kind was had before the Board. Certainly this

2. United States Navigation Co. v. Cunard S. S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408.

3. As a matter of fact damages are the only form of relief sought by the plaintiff now in view of a pending motion to amend the complaint by striking therefrom the prayer for injunctive relief.

case is different from those wherein are involved the Shipping Board and the Interstate Commerce Commission. Generally speaking, these administrative agencies are clothed with exclusive primary jurisdiction to award damages. In this case, in no event, can the Civil Aeronautics Board award damages and resort for the same can be to the court alone. We are here confronted then with the question of whether, in the absence of the requirement of the exercise of expert and technical knowledge of the regulated industry, the doctrine of primary jurisdiction compels the submission to the Civil Aeronautics Board for determination as to validity under the Civil Aeronautics Act (its only proper field) of every means and method allegedly employed in furtherance of violations of the anti-trust laws. To hold that the question must be answered in the affirmative because § 494 of the Civil Aeronautics Act relieves "(a)ny person affected by any order made under sections 488, 489, or 492 of this chapter" from the operation of the anti-trust laws, is untenable.

Section 488 regulates the forms of ownership, leasing and control of air carriers. Section 489 regulates interlocking officers and directors of air carriers who have stock interests in other air carriers or corporations owning stock of other air carriers and also regulates relationships between officers and directors of air carriers with other carriers in relation to the negotiability, hypothecation of and sales of securities of other air carriers. Section 492 provides broadly for the filing of agreements and contracts (or memoranda thereof where oral) with the Civil Aeronautics Board where they affect air transportation as specified.

At this stage of this case we cannot say that the means and methods alleged in the complaint herein fall into those classifications and to answer that all of them arbitrarily must be submitted to the Civil Aeronautics Board initially, raises serious considerations of practicality. Having in mind that the plaintiff herein, unlike its counterpart in the S. S. W. case, was granted a certificate of convenience and necessity after due adjudication by the Civil Aeronautics Board it is not reasonable to assume the possibility that it would approve a conspiratorial combination to exclude it from the industry, if, indeed, imagination can be stretched sufficiently to envision the filing of such a written agreement or a memorandum of an oral one.[4] Furthermore, an affirmative answer would mean that the Civil Aeronautics Board has the power to, and would, hear evidence of alleged acts performed in the past for the sole purpose of determining whether they constitute conduct in violation of the Civil Aeronautics Act so that a suit might be instituted to recover damages under the anti-trust laws.

I cannot conceive that this is the proper accommodation of the two statutes as they affect this case, since such a construction would nullify the express provision of § 676 of the Civil Aeronautics Act which is obviously designed to give survivorship to the remedies embodied in the anti-trust laws. See opinion, 107 F.Supp. 205.

This case does not generate in the Civil Aeronautics Act such a repugnancy to the anti-trust laws as to warrant the limitation of the latter for which the defendants argue. Compare Consolidated Gas Electric Light & Power Co. v. Pennsylvania Water & Power Co., 4 Cir., 194 F.2d 89, 97, et seq., certiorari denied 343 U.S. 963, 72 S. Ct. 1056.

Moreover, the type of damages sought in the instant case by plaintiff as a competi-

---

4. The majority in the S. S. W. case, by analogy to the Cunard case (distinguished in the opinion, 107 F.Supp. 211, as a case involving an administrative board clothed with exclusive primary jurisdiction and power to award reparations) was constrained to submit all allegations of the complaint in that case to the primary jurisdiction of the Civil Aeronautics Board because the Board had construed

" 'contract or agreement' within the meaning of 49 U.S.C.A. § 492 as 'intended, like the word "contract" in section 1 of the Sherman Act, [15 U.S.C.A. § 1], to include all understandings which are, or may become, the basis of concerted action.' " (24)

"24. Transcontinental & Western Air, Inc.—Delta Air Lines, Inc., Interchange of equipment, 8 C.A.B. 857, 860 (1947)."

tor injured by a conspiracy in violation of the anti-trust laws may not come within the prescription of those cases barring any recovery of damages from the imposition of rates given "legal" sanction by an administrative body. In cases where a shipper or passenger brings suit, any attempt to recover the difference between the rate which would have prevailed, absent the conspiracy, and the authorized rate, is proscribed as contravening the rationale of uniformity and prevention of discrimination underlying the administrative establishment of a rate. Compare Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183. See also State of Georgia v. Pennsylvania R. Co., supra, 324 U.S. at page 453, 65 S.Ct. at page 724. However, the plaintiff asserts that the damage that it has sustained has resulted from defendants' conspiracy to drive it out of business and that it is to be measured in terms of "damage to the good will, the business, the property, the competitive position, and the future prospects of plaintiff."

Until, at least, the stage in these proceedings is reached when the issues and proofs may be more fully canvassed by proper pre-trial methods it is not necessary to anticipate the admissibility or inadmissibility of proofs of damages in so far as they may trespass on the area heretofore proscribed by the courts.

The motion to dismiss, on rehearing, is denied.