314

In the matter of the
United States-South America Route Case } Docket 12895

### ORDER INSTITUTING INVESTIGATION

The Board has decided that it is appropriate at this time to institute a comprehensive review of the U. S. flag carrier route pattern between the United States and South America. The most recent extensive study of that route structure was undertaken in 1946, some 15 years ago. Since then considerable developments, hereinafter referred to, have taken place which affect these services and require the review here contemplated.

Three U. S. carriers are presently certificated to provide the major services to points in South America. Pan American World Airways, Inc. (Pan American), is authorized to provide service between San Francisco, Los Angeles, Houston, New Orleans, Washington, Philadelphia and New York-Newark, on the one hand, and points on the north and east coasts of South America including Rio de Janeiro and Buenos Aires, on the other hand, via points in Central America and the Caribbean, on route 136. Pan American-Grace Airways, Inc. (Panagra) is authorized to provide service between Balboa, Guayaquil, Lima, Santiago and Buenos Aires, via intermediate points,

primarily along the west coast of South America, on route 146. Braniff Airways, Inc. (Braniff) is authorized to provide service between Houston and Miami, on the one hand, and Havana, Balboa, Bogota, Guayaquil, Lima, Rio de Janeiro and Buenos Aires, on the other hand, via intermediate points, on route FAM–34.[1]

As previously indicated, the basic U. S. flag carrier route patterns between the United States and South America presently in effect were established some years ago in the *Additional Service to Latin America Case,* 6 C. A. B. 857 (1946). Matters involving service between the United States and South America were, however, further considered in the *New York-Balboa Through Service Proceeding, Reopened,* 18 C. A. B. 501 (1954), 20 C. A. B. 493 (1954), and certain through-service aircraft interchange agreements were approved as a result of the *New York-Balboa* case by Order E–9481, 21 C. A. B. 1005 (1955). Also, the certification of a Los Angeles/San Francisco-Guatemala City route, last considered in Order E–9514, August 3, 1955, permitted Pan American to operate between the west coast of the United States and points in South America.

Since the original establishment of the basic South America route structure, there have been basic changes in technology and patterns of service. Thus, in 1944, the range of aircraft was relatively limited and operational requirements, as well as economic considerations, required multiple stops on the long-haul service. Today, available aircraft can, and do, serve the most distant points on a

---

[1] Delta Air Lines, Inc. (Delta) is authorized to serve Caracas and certain Caribbean points on its Caribbean route 114 from Houston and New Orleans; and Aerovias Sud Americana, Inc. (ASA) is authorized to provide cargo and mail service (on a nonsubsidy basis) between Florida points and points in Central and South America. The only South American points presently served by ASA are Quito and Guayaquil, Ecuador.

nonstop basis. Of the relative attractiveness of nonstop to multi-stop service in comparable equipment there can be no question; consequently, the changed technology which has made nonstop services operationally feasible warrants a careful review of the economics of such service in relation to the existing and future route structure. Similarly, changes have taken place in the competitive picture. Prior to the decision in the *Latin America Case, supra,* Pan American and Panagra operated in competition with three foreign air carriers. Today, 19 South American foreign air carriers are authorized to serve the United States-South America market. There has also been an increase in service within South America by local carriers. Not only do these services rendered by non-U. S. flag carriers dilute the potential economic support for the services of the U. S. carriers, but also they bring into question the need for point-to-point duplication of such services. In this connection, we cannot be unmindful of the fact that the U. S. flag carriers' operations are marginal economically.

Our concern with the current South America route pattern is not a recent one. As long ago as 1954, the Board publicly suggested that the available traffic in South America did not warrant continuation of three United States flag services.[2] In the Interim Opinion in the *New York-Balboa* case, *supra,* it was noted that Braniff was not an effective competitor for South American traffic and that the public interest of the United States would be served by the establishment of a single independent carrier operation between Houston and Miami, on the one hand, and the points served on the combined routes of Panagra and Braniff, on the other hand. The Board then also voiced its interest in making

---

[2] *Reopened New York-Balboa Through Service Case,* 18 C. A. B. 501.

such a route available to northeastern United States traffic. The hope then was that the carriers concerned would voluntarily seek to resolve the problem along the lines suggested.[3] In this connection, we were fully cognizant of the recent institution of a suit by the Attorney General against Pan American, Panagra, and W. R. Grace and Company, which, on antitrust grounds, sought divestiture by Pan American and Grace of their interest in Panagra. However, the principals did not come forward with a proposal. Instead, the suit was permitted to proceed to trial and judgment, and it is currently pending possible review by the United States Supreme Court.[4]

Assuming that the District Court's judgment, at least insofar as it ordered divestiture by Pan American of its interest in Panagra, is sustained,[5] it is clear that the Board will, in the near future, be called upon to consider further the consequences of divestiture with respect to U. S. flag services in South America. And in order for the Board to be able promptly and effectively to take such further steps as might be required in the circumstances, it would be well for it to have considered carefully the overall need for U. S. flag services in South America in the light of a litigated record.

Since the selection of carrier issues will remain somewhat clouded until final resolution of the pending anti-

---

[3] The powers granted the Board in the Federal Aviation Act of 1958 and its predecessor, the Civil Aeronautics Act of 1938, do not include authority to compel merger, or to terminate the entire route of a carrier.

[4] The District Court for the Southern District of New York handed down a decision on May 8, 1961, *U. S.* v. *Pan American World Airways, Inc., W. R. Grace and Company, and Pan American-Grace Airways, Inc.,* Civ. 90–259. Pan American filed a notice of appeal in the Supreme Court on May 11, 1961.

[5] The Attorney General had sought divestiture by both Grace and Pan American.

trust suit, it appears appropriate and in the interest of a sound and orderly disposition of this proceeding to consider separately the appropriate route structure prior to consideration of selection of carrier matters. We recognize that factual matters relative to public convenience and necessity issues may also have their carrier selection aspects; similarly, we are not unmindful of the fact that, while the prescribed route pattern can be established in substantial part without regard to carrier selection, some adjustment in route pattern may be found necessary at the time we decide the carrier selection issues. We anticipate, however, the full cooperation of all concerned to facilitate an appropriate separation of these issues.

The Board intends that the scope of the proceeding instituted herein include issues with respect to authorization of services to new points, the deletion of presently certificated points, and the consolidation of separate routes into single routes.[6] Caribbean points will be considered only to the extent that they are in issue as possible intermediate points on United States-South America routes, and the proceeding will not examine services wholly within the Caribbean area, or between points in the United States and the Caribbean.

In its study of the South American route pattern, the Board has tentatively concluded that an east coast route and a west coast route are required. The details of the routes are set forth in the attached analysis. In addition, and because we have found that considerable route modifications are necessary to meet present needs and problems, we have compiled and attached hereto data which

---

[6] Pending certificate applications involving service between the United States and South America will be considered for consolidation upon appropriate request submitted within 20 days of the date of service of this order. Applications not moved for consolidation will be subject to dismissal for lack of prosecution.

we believe will facilitate hearing and decision. The attached materials should serve as the focal point for the trial of this case, and we direct that the presentation of participants in the proceeding, unless otherwise ordered by the Board upon good cause shown therefor, be pointed to showing why and in what manner the conclusions derived from the study should be modified. Such an approach can restrict the hearing to relevant and material facts and otherwise minimize procedural delay.

MR. JUSTICE BRENNAN, with whom THE CHIEF JUSTICE concurs, dissenting.

The Court holds that the "narrow questions presented by this complaint have been entrusted to the [Civil Aeronautics] Board and that the complaint should have been dismissed." The ground of the decision is that the provisions for economic regulation in the Civil Aeronautics Act of 1938, which were reenacted without change in the Federal Aviation Act of 1958, displaced the Sherman Act insofar as "all questions of injunctive relief against the division of territories or the allocation of routes or against combinations between common carriers and air carriers" is concerned. With all respect, I think this conclusion is contrary to reason and precedent.

I.

The root error, as I see it, in the Court's decision is that it works an extraordinary and unwarranted departure from the settled principles by which the antitrust and regulatory regimes of law are accommodated to each other. As a result of today's decision, certain questions under the antitrust laws are placed in the exclusive competence of the Board and will not be the subject of original court actions to enforce the antitrust laws. In effect, a

*pro tanto* repeal of the antitrust laws is contemplated, since the law to be applied in Board proceedings under § 411 is based not upon the antitrust laws but upon the "public interest" and "competition to the extent necessary" standards of the Board's overall mandate. See 49 U. S. C. § 1302. And though the Board's decisions under § 411 are subject to judicial review, presumably such review will be limited to ensuring that the Board adheres to the criteria set out in its mandate. See *American Airlines, Inc.,* v. *North American Airlines, Inc.,* 351 U. S. 79, 85.

But of the instruments of accommodation that are available, *pro tanto* repeal of the antitrust laws by implication from a regulatory statute such as the Aeronautics Act is surely the very last that ought to be resorted to. It cannot be justified as a matter of statutory construction. Section 414 of the Act immunizes from the operation of the antitrust laws transactions as to which the Board has issued orders of approval under §§ 408, 409, and 412 (consolidations and mergers, interlocking directorates, and cooperative working arrangements). The existence of this express and specific provision for exemption would seem to presuppose the general applicability of the antitrust laws to the airline industry, and to limit the Board's exempting power to the enumerated orders, which do not include orders issued under § 411; the Court concedes that the Board has no power under §§ 408, 409, or 412 to approve the transactions upon which the instant suit is predicated. Furthermore, it is odd indeed that the Board should have express statutory authorization to enforce §§ 2, 3, 7, and 8 of the Clayton Act (see 15 U. S. C. § 21) while the Sherman Act is not enforceable by any procedure with respect to the wide range of transactions comprised in the rule laid down by the Court today. It is odd because the Clayton Act was intended to supplement and reinforce the basic antitrust prohibitions of the Sher-

man Act, rather than to form an independent and self-sufficient scheme of regulation. By its action today, the Court subjects the airline industry to a crazy quilt of antitrust controls that Congress can hardly have contemplated.

Two further aspects of the Aeronautics Act cut against the Court's interpretation. The first is the presence of a saving clause: "Nothing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 49 U. S. C. § 1506. The second is the total absence from the Act of any provision for damages or reparations. This *lacuna* leads the Court, somewhat unusually in light of certain prior decisions,[1] to intimate that the damages remedy under the antitrust laws survives where the injunctive remedy is barred—an impractical solution, as I shall try to demonstrate, see *infra,* pp. 326–327. The more reasonable interpretation of the absence of a provision for damages is that the Act was not intended to be an absolutely all-inclusive scheme of regulation which would oust every remedy afforded by a different statute or by the common law. The antitrust laws were to be allowed to function, save as regards the specific exemptions provided for in § 414, and these laws would support actions for damages and for equitable relief.

I am satisfied that the scheme of the Aeronautics Act refutes any inference that *pro tanto* repeal of the antitrust laws was intended. Nor does the legislative history furnish any support for the Court's position. The Court cites but a single sentence: "It is the purpose of this legis-

---

[1] See *T. I. M. E. Inc.* v. *United States,* 359 U. S. 464, and cases cited therein. At least one Federal Court of Appeals has held that the CAB's lack of power to award money reparations leaves open a court action for damages sounding in tort. *Fitzgerald* v. *Pan American World Airways, Inc.,* 229 F. 2d 499 (C. A. 2d Cir. 1956).

lation to coordinate in a single independent agency all of the existing functions of the Federal Government with respect to civil aeronautics . . . ." H. R. Rep. No. 2254, 75th Cong., 3d Sess., p. 1. Prior to the enactment of the Aeronautics Act of 1938, the regulation of civil aviation had been divided between the Interstate Commerce Commission, the Department of Commerce, and the Post Office Department; and the plain meaning of the quoted sentence, especially in light of the debates that preceded passage of the Act, is that as a result of the Act regulation of civil aviation would be centralized in one agency, the CAB. See Hearings on H. R. 9738 before the House Committee on Interstate and Foreign Commerce, 75th Cong., 3d Sess., p. 37.

But a still more conclusive refutation of the Court's reading of the Act is provided by an unbroken chain of decisions by this Court rejecting, in comparable situations, claimed *pro tanto* repeals by implication of the antitrust laws. Perhaps the leading case is *United States* v. *Borden Co.*, 308 U. S. 188, 197–206, where the Court held emphatically that the enactment of a regulatory statute would not be deemed to work a *pro tanto* repeal of the antitrust laws, save only if there was a plain repugnancy between the two regimes (which the Court does not suggest, except in the vaguest conclusional terms, is the case here), in which case repeal would be implied only to the extent of the repugnancy. But the holding of the *Borden* case had been anticipated in much earlier decisions of the Court. See *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 314–315; *Keogh* v. *Chicago & N. W. R. Co.*, 260 U. S. 156, 161–162; *Central Transfer Co.* v. *Terminal Railroad Assn.*, 288 U. S. 469, 474–475; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U. S. 500, 513–515. See also *United States* v. *Joint Traffic Assn.*, 171 U. S. 505; *United States* v. *Pacific & Arctic Ry. & Nav. Co.*, 228 U. S. 87, 107–108. And the

canon of construction that repeals by implication are not favored has even a longer history in this Court's jurisprudence. See, *e. g., United States* v. *Tynen,* 11 Wall. 88, 92; *Henderson's Tobacco,* 11 Wall. 652.

*Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 456–457, strongly reaffirmed the *Borden* principle in the context of a regulatory scheme, the Interstate Commerce Act, no less pervasive than that which governs the airline industry. I believe it is accurate to say that the Court had never until today deviated from this position. See *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 205–206; *Allen Bradley Co.* v. *Local Union No. 3,* 325 U. S. 797; *United States* v. *Radio Corp. of America,* 358 U. S. 334; *Maryland & Va. Milk Producers Assn.* v. *United States,* 362 U. S. 458, 464–466; *California* v. *Federal Power Comm'n,* 369 U. S. 482. Cf. *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 226–227; *Federal Maritime Bd.* v. *Isbrandtsen Co.,* 356 U. S. 481. Only last Term, in *California* v. *Federal Power Comm'n, supra,* we wrote: "Immunity from the antitrust laws is not lightly implied. . . . We could not assume that Congress, having granted only a limited exemption from the antitrust laws, nonetheless granted an overall inclusive one. See *United States* v. *Borden Co.,* 308 U. S. 188, 198–202." 369 U. S., at 485.

Furthermore, although this Court had not until today passed on the question whether the Aeronautics Act repealed by implication any part of the antitrust laws, the lower federal courts have uniformly held that it did not. See *S. S. W., Inc.,* v. *Air Transport Assn.,* 89 U. S. App. D. C. 273, 191 F. 2d 658 (1951), cert. denied, 343 U. S. 955; *Apgar Travel Agency, Inc.,* v. *International Air Transport Assn.,* 107 F. Supp. 706 (D. C. S. D. N. Y. 1952); *Slick Airways, Inc.,* v. *American Airlines, Inc.,* 107 F. Supp. 199 (D. C. D. N. J. 1951), petition for prohibition dismissed *sub nom. American Airlines* v. *Forman,* 204 F. 2d 230

(C. A. 3d Cir. 1953), cert. denied *sub nom. American Airlines, Inc.,* v. *Slick Airways, Inc.,* 346 U. S. 806.

Finally, it has been held that § 411 of the Aeronautics Act was modeled on § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45, and that decisions under § 5 are precedents for the construction of § 411. *American Airlines, Inc.,* v. *North American Airlines, Inc.,* 351 U. S. 79, 82. And § 5 has uniformly been construed to provide for dual enforcement by courts and agency of the antitrust laws, not exclusive enforcement by the agency. *United States Alkali Export Assn.* v. *United States,* 325 U. S. 196, 205–211; *Federal Trade Comm'n* v. *Cement Institute,* 333 U. S. 683, 692–695; *United States* v. *Charles Pfizer & Co.,* 205 F. Supp. 94 (D. C. S. D. N. Y. 1962); *United States* v. *Cement Institute,* 85 F. Supp. 344 (D. C. D. Colo. 1949).

In light of this decisional history, it cannot be supposed that Congress, when it first enacted a scheme of comprehensive economic regulation of the airline industry in 1938 and when it reenacted these economic provisions without change in 1958, intended any displacement of the antitrust laws beyond that specifically provided for in § 414. Nor did the decisions I have cited rest upon the mechanical application of one of the common law's canons of statutory construction. However questionable the principle that repeals by implication are not favored may be in other contexts, it is entirely sound when dealing with the antitrust laws, and especially the Sherman Act. For this Act embodies perhaps the most basic economic policy of our society, basic and continuing: abhorrence of monopoly. The kind of conduct proscribed by the Sherman Act is simply not such that congressional silence may be interpreted as congressional approval. Where, as here, neither the scheme of the regulatory statute nor anything in the legislative history supports a *pro tanto* repeal by implication of the Sherman Act, it

seems to me inescapable that we must reject such a solution. Nor can it be seriously contended that on the facts of the instant case judicial enforcement of the antitrust laws would disrupt, even slightly, the Board's regulation of civil aviation. See Part III, p. 327, *infra*. And since no question of certification for foreign air carriage is involved, there is no danger of court interference in matters committed to the President's discretion by 49 U. S. C. § 1461.

## II.

The decision today is, to me, not only unsound in law, but impractical. The Court purports to lay down a general rule governing the division of responsibilities between the courts and the CAB; and while certain antitrust questions, including those at bar, are to be withdrawn from the courts, others are to remain subject to judicial enforcement. I consider the Court's proposed line of demarcation between the judicial and administrative regimes unsupportable. I see no basis upon which to withdraw questions of route allocation, territorial division, and combinations between common carriers and air carriers from judicial cognizance, yet leave unaffected (as the Court appears to intend to do) questions of rate fixing, combinations between air carriers *simpliciter,* and other serious anticompetitive practices. By what arcane logic does a conspiracy to fix routes go more to the heart of the regulatory scheme than a conspiracy to fix rates? True, the Board, while it has authority to fix routes in foreign air transportation, has no authority to fix rates therein; but the Act broadly prohibits all forms of unjust discrimination, which of course would embrace many rate-fixing practices. See 49 U. S. C. § 1374 (b); *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 478, 480 (dissenting opinion). And what justification can there be for the Board's having exclusive jurisdiction of a combination one party to which is probably outside the Board's jurisdic-

tion, see *infra,* pp. 330–331, but not of a combination both parties to which are clearly within the Board's jurisdiction? The only explanation I can conceive for these dubious distinctions is that the Court does not want to go so far as flatly to overrule some well-established decisions of this Court.[2]

I find it equally difficult to understand the Court's apparently limiting its *pro tanto* repeal of the antitrust laws to questions of injunctive relief. It is true that an order of divestiture or some other equitable remedy may be more effective to deter certain antitrust violations than either criminal or damages sanctions. But the difference in effectiveness is one only of degree. An air carrier is not likely to persist in a course of conduct if heavy criminal penalties and awards of treble damages may be visited upon it. But just this possibility the Court seems to allow. I find it hard to follow the Court's attempted justification for mutilating the antitrust laws in terms of avoiding

---

[2] See *United States* v. *Pacific & Arctic Ry. & Nav. Co.,* 228 U. S. 87, 107–108; *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439; *Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156, 161–162; *Central Transfer Co.* v. *Terminal Railroad Assn.,* 288 U. S. 469, 475; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 513–515. The Court's handling of *Georgia* v. *Pennsylvania R. Co., supra,* seems to me particularly disingenuous. The Court concedes that a conspiracy to secure CAB approval of illicit agreements might form the predicate of an antitrust suit, yet nowhere explains why the use of negative control to further a scheme of monopolization by preventing CAB approval of a route extension for Panagra cannot form such a predicate. Furthermore, it is not the case that the ICC was helpless to grant the relief sought in *Georgia* v. *Pennsylvania R. Co.* The Court conceded that the Commission had "authority to remove discriminatory rates of the character alleged to exist here." . 324 U. S., at 459. To be sure, the Commission did not have authority to regulate rate-fixing combinations as such. But neither has the CAB authority to prohibit violations of the antitrust laws as such; it is limited by its mandate, so the Court holds, to facilitating "competition to the extent necessary."

clashes between two regimes of law, the administrative and the judicial, when, the mutilation achieved, the clashes remain acutely present. In part, I must conclude that the Court's artificial distinction again was prompted by a desire to skirt, however disingenuously, prior holdings.[3] In addition, the Court had to conjure with the fact that the CAB's statute nowhere provides a remedy, damages or reparations, for past misconduct.

## III.

I should also like to suggest the unreality of the Court's decision in the light of the particular circumstances of the instant case. By its decision today the Court brings to naught nine years of litigation. Yet these nine years actually represent only the most recent phase of a continuing problem first placed before the Civil Aeronautics Board 22 years ago.[4] For 22 years Pan American World Airways has staved off the day of reckoning in respect to the tactics which, Judge Murphy found below, violated § 2 of the Sherman Act. Today's decision vindicates these tactics beyond Pan American's fondest expectations, for the problem is now back with the CAB which has from the outset protested its inability to deal with it.

This suit was instituted by the Government at the urging of the CAB, which in addition filed an *amicus curiae* brief in the District Court in support of the Government's

---

[3] See *United States* v. *Pacific & Arctic Ry. & Nav. Co.,* 228 U. S. 87, 105; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.,* 297 U. S. 500, 515.

[4] On December 16, 1941, Grace filed a petition with the CAB requesting modification of Panagra's certificate so as to provide for a terminal in the continental United States; on April 29, 1942, Grace requested the Board to proceed under § 411 to order Pan American to divest itself of its holdings in Panagra. See *W. R. Grace & Co.* v. *CAB,* 154 F. 2d 271, 274 (C. A. 2d Cir. 1946), cert. dismissed for mootness *sub nom. Pan American Airways Corp.* v. *W. R. Grace & Co.,* 332 U. S. 827.

position. And repeatedly over a period of many years, the Board has adverted to its felt helplessness in the face of the divided control of Panagra by two powerful corporations, one the dominant United States company in the field of foreign transportation.[5] To be sure, we are not obliged to honor the Board's disinclination to assume jurisdiction. *Trans-Pacific Airlines, Ltd.,* v. *Hawaiian Airlines, Ltd.,* 174 F. 2d 63 (C. A. 9th Cir. 1949). But it is entitled to some weight, see 3 Davis, Administrative Law (1958), 14, and indeed, since the Board's position has been long and consistently adhered to, to great weight. *United States* v. *Radio Corp. of America,* 358 U. S. 334, 350, n. 18. The search for a practical accommodation of court and agency, which is the problem of this case, is not advanced by our ignoring the agency's considered sense of self-limitation.

It is not as if the Board's hesitancy to move against the abuses disclosed by the record in this case were not based upon substantial considerations. We may concede the breadth of the Board's power under § 411 to remedy unfair methods of competition, which may sometimes be violations of the Sherman Act, yet still recognize the unsuitableness of such a remedy in the particular circumstances of this case. For one thing, I should think a proceeding respecting control of Panagra would be rather lopsided unless the Board had jurisdiction of Grace; but I am not sure that could be done. Section 411 only proscribes unfair methods of competition by air carriers and ticket agents. Grace is neither, unless it fits the broad

---

[5] See *Panagra Terminal Investigation,* 4 C. A. B. 670, 678 (1944); *Additional Service to Latin America,* 6 C. A. B. 857, 913–914 (1946); *Pan American-Panagra Agreement,* 8 C. A. B. 50, 61 (1947); *New York-Balboa Through Service Proceeding, Reopened,* 18 C. A. B. 501, 504–506 (1954); *Reopened New York-Balboa Through Service Proceeding,* 20 C. A. B. 493, 516–517 (1954). Cf. *New York-Mexico City Nonstop Service Case,* 25 C. A. B. 323 (1957).

language in which the Act defines an "air carrier" as any-one "who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air trans-portation." 49 U. S. C. § 1301 (3). It is not entirely clear that "air carrier" may be read as including a 50% owner of an air carrier, for the Act in general does not purport to regulate stockholders of its subject carriers, and where it does, notably in § 408, it does so explicitly.[6] The opin-ion of the Court sees fit not to resolve this jurisdictional difficulty. I fear the Board has solid justification for not proceeding against Pan American unless it can proceed against Grace as well. But at all events the Court's silence is sure to result in an added step in this already intolerably prolonged litigation.

A further basis for the Board's hesitancy is that the Board has no experience in the enforcement of the anti-trust laws, because § 411 has only been used against common-law unfair competition, never against practices deemed unfairly competitive by virtue of the antitrust laws. Hale and Hale, Competition or Control IV: Air Carriers, 109 U. of Pa. L. Rev. 311, 346–347 (1961).[7] Most of the legal issues which have arisen in the instant litigation—the right of a joint owner to exercise his nega-tive control in an anticompetitive fashion, the substan-tiality of the commerce restrained as a result of the

---

[6] For example:

"It shall be unlawful unless approved by order of the Board as provided in this section—

.     .     .     .     .

"(2) For any air carrier, any person controlling an air carrier, any other common carrier, or any person engaged in any other phase of aeronautics, to purchase, lease, or contract to operate the prop-erties . . . of any air carrier . . . ." 49 U. S. C. § 1378 (a) (2).

[7] Also, although the CAB has express authority to enforce the Clayton Act, see 15 U. S. C. § 21, I have found no instance of its ever having attempted to do so.

defendants' conduct, the relevant geographical and services markets, the appropriateness of divestiture as a remedy, and so forth—are typical antitrust problems and not at all typical airline law problems. The expertness required is that of the judge skilled in antitrust adjudication—not that of the Board, which, so far as I can tell, has never dealt with an antitrust problem.

Nor is remission of the instant case to the CAB necessary to protect the integrity of the Board's regulatory scheme for the airline industry. Pan American argues that if its holdings in Panagra are divested, Panagra will apply for and be granted terminal points in the continental United States, with the result that Pan American will be driven out of business on many routes, to the serious detriment of the airline industry. But there is more to acquiring a route certificate than applying for it. If Panagra, freed of Pan American's negative control, applies for a northward extension of its routes, it will be open to Pan American to argue before the Board the unwisdom of its granting the application. A judicial order in the instant case would not affect a single route, but would simply free the process whereby routes are established and territories are divided from the obstructive effects of monopolistic tactics. Judicial enforcement of the Sherman Act here would thus remove the clog of monopolization from the administrative process—not disrupt that process. Cf. *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439. The Court's reliance on *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, and *Keogh* v. *Chicago & N. W. R. Co.*, 260 U. S. 156, is misplaced. The plaintiff in *Keogh* sought damages under the antitrust laws, complaining that but for the conspiracy the rates he had paid, though lawful because approved by the ICC, would have been lower. The Court held that the exclusive remedy for excessive rates had been vested by Con-

gress in the ICC. It did not matter on what theory the shipper sought to recover; the courts had no power to undo a lawful rate by granting damages, whether on common-law grounds (as in *Abilene*) or under the antitrust laws. The Court in *Keogh* made very plain, however, that injunctive relief in respect of a conspiracy to raise rates might lie, at least if such relief was sought by the Government, as here. 260 U. S., at 161–162. For (as *Georgia* shows) an injunction may be granted with no disturbance to the existing rate structure.

It should also be noted that the Court's decision today vindicates Pan American's hardly creditable "tactic . . . characteristic of its litigious nature" of first raising the jurisdictional issue in a post-trial brief filed six years after the complaint. 193 F. Supp., at 46. Of course, we are obliged to consider such issues *sua sponte*. *United States* v. *Western Pacific R. Co.*, 352 U. S. 59, 63; Note, Regulated Industries and the Antitrust Laws: Substantive and Procedural Coordination, 58 Col. L. Rev. 673, 690 and n. 114 (1958). But I find it a wry commentary on the Court's result that every factor of fairness and practicality argues against our abdicating jurisdiction of the present case.

## IV.

In seeking to accommodate the regulatory and antitrust regimes by means of *pro tanto* repeal of the antitrust laws, the Court does not tell us why it has departed from the usual pattern of preferring a more flexible technique of accommodation: that afforded by the doctrine of primary jurisdiction. See generally 3 Davis, Administrative Law (1958), 1–55. That doctrine requires that the courts abstain from proceeding in a case of which they have original jurisdiction, remitting the parties in the first instance to their rights and remedies before the agency, where neces-

sary to protect the integrity of the regulatory scheme administered by the agency. Such a requirement of prior resort does not preclude a later judicial antitrust proceeding, but simply ensures that the later proceeding will fully recognize the agency's interest in the premises. The antitrust laws are in no wise repealed. Cf. *Federal Maritime Bd.* v. *Isbrandtsen Co.,* 356 U. S. 481, 498–499. This mode of resolving conflicts between court and agency avoids the practical and conceptual difficulties of *pro tanto* repeals by implication. Until today, the Court had never failed to invoke primary jurisdiction in preference to repeal by implication as a means of accommodating the antitrust and regulatory laws; I see no basis for deviation in the instant case from that salutary approach. Certainly the Court suggests none.

I must in candor add that to apply the doctrine of primary jurisdiction to the case at bar would be somewhat of an extension of our decisions in the area, so jealously have we guarded the obligation of judicial enforcement of the antitrust laws. The tendency of the cases has been to invoke the doctrine not when there are simply overlapping judicial and administrative remedies for the same conduct, as is the case here, but only when "there is a possibility that a subsequent administrative decision would approve the questioned activities," as is not true here, since the approval power vested in the CAB by § 414 does not include orders under § 411. Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv. L. Rev. 436, 464 (1954). Compare *United States Nav. Co.* v. *Cunard S. S. Co.,* 284 U. S. 474, and *Far East Conference* v. *United States,* 342 U. S. 570, with *United States* v. *Pacific & Arctic Ry. & Nav. Co.,* 228 U. S. 87; *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439; *United States* v. *Radio Corp. of America,* 358 U. S. 334; and *California* v.

*Federal Power Comm'n,* 369 U. S. 482. See generally Jaffe, Primary Jurisdiction Reconsidered: The Anti-Trust Laws, 102 U. of Pa. L. Rev. 577 (1954). But even if it would take some straining to fit the instant case within the established framework of the law of primary jurisdiction, what the Court has done today is a far graver departure from heretofore settled guideposts of the law.[8]

---

[8] Since the Court disposed of the case at bar on jurisdictional grounds and did not reach the merits of the antitrust issues, I deem it inappropriate for me to intimate any view of those merits.